**2024 IL 129133**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 129133)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
MICHEAL D. CHATMAN, Appellant.

*Opinion filed January 19, 2024.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1     In January 2020, the State charged defendant, Micheal D. Chatman, with four counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2018)) in connection with the shooting death of Ricky Green. Prior to trial, the State sought to introduce statements made by Dominique "Dee" Collins, who was unable to be located, under the forfeiture by wrongdoing exception to the hearsay rule (Ill. R. Evid. 804(b)(5)

(eff. Jan. 1, 2011)) and the sixth amendment confrontation clause (U.S. Const., amend. VI). The Champaign County circuit court allowed Collins's statements to be introduced, finding him unavailable and that the State had made reasonable, good-faith efforts to secure his presence at trial. A jury found defendant guilty of felony murder, and the court sentenced him to prison. The appellate court affirmed. 2022 IL App (4th) 210716, ¶ 1.

¶ 2 Now on appeal, defendant argues the State was required to demonstrate good-faith efforts to procure Collins's presence at trial but failed to do so. We affirm.

¶ 3                                    BACKGROUND

¶ 4 Not long after midnight on March 23, 2018, Ricky Green was shot twice and killed in Champaign. Shortly before his death, Green was in a car with defendant, codefendant Michael Simmons, and Kotia Fairman. After police officers followed their car, Green, defendant, and Simmons ran because they had guns and drugs in the car. While they fled, an altercation ensued between Green and defendant, during which defendant shot Green. Items tied to defendant and Simmons were later found in the car, including a .357 Magnum revolver, which was not used to shoot Green.

¶ 5 Based on this incident, the State charged defendant with unlawful possession of a firearm by a felon and obstruction of justice. In August 2018, defendant pleaded guilty and received a sentence of probation. The State did not charge him with Green's murder until January 2020. This occurred after the State on December 30, 2019, secured a video-recorded statement from Dee Collins, wherein he related to Detective Jeremiah Christian that defendant had confessed to Collins shortly after the shooting.

¶ 6 In October 2020, the State filed a motion *in limine* to admit Collins's statements due to forfeiture by wrongdoing. The motion alleged Collins was interviewed on December 30, 2019, after his arrest on a traffic warrant. Collins said he had been with defendant the morning after the shooting when defendant bragged about killing Green. Defendant told Collins that he, Simmons, and Green were in the back seat of a vehicle and defendant had planned to rob Green of a gun. As they fled from the police, defendant grabbed Green's gun. When Green later tried to retrieve it, defendant feared for his safety and shot Green.

¶ 7    The motion claimed defendant talked in recorded jailhouse phone calls about Collins speaking to the police and making sure he did not testify. Although defendant did not give specific orders during the calls to prevent Collins from testifying, defendant's father and brother indicated they would ensure Collins would not cooperate with the police or appear at trial. On February 16, 2020, Collins sent an officer a text message that read, "Everybody think I told on Mikey [(Defendant)] idk how they getting this information I've been getting threats from a lot of people." Collins fled to Iowa. On March 12, 2020, Collins met with a detective in Iowa and stated he had been receiving threatening text messages and social media posts from people associated with defendant and Simmons. The motion claimed Collins had moved out of state because he feared for his life. On October 9, 2020, Detective Christian sent a text message to Collins's phone number. Collins initially did not respond, but a later response said Christian had the wrong number.

¶ 8    In February 2021, the circuit court held a hearing on the State's motion. The State introduced defendant's jailhouse phone calls pertaining to Collins and Collins's December 2019 video-recorded statement. Following arguments, the court found the State proved by a preponderance of the evidence that defendant intended by his actions to prevent Collins, a material witness, from testifying. The court reserved the issue of whether the State had made reasonable efforts to secure Collins's presence for a later hearing.

¶ 9    That hearing took place on May 6, 2021, and Detective Christian testified regarding his efforts to locate Collins. He tried locating Collins on February 16, 2021, through a posting on "I-Board," an intelligence-based software program that disseminates information locally to various law-enforcement agencies and all officers. He reposted it on April 28 and May 5. Christian indicated the postings had been viewed 119 times without a response. He noted Collins had not been listed as a missing person in LEADS [1] or on any list with the Federal Bureau of Investigation.

---

[1]LEADS is Illinois's Law Enforcement Agencies Data System. See, *e.g.*, 20 ILCS 2605/2605-375 (West 2018).

¶ 10    Prior to the reasonable efforts hearing, Christian had traveled to Iowa to meet with Collins. He later communicated with law enforcement in Davenport, Iowa, in hopes of finding him. Christian testified he served a subpoena in Aurora on Demetria Chatman, defendant's mother, who was also related to Collins, but denied any contact with Collins. In listening to defendant's jailhouse calls, Christian indicated defendant told a third party that he and his counsel had been unable to contact Collins. Christian stated he had received information that Collins was in Indianapolis "for a show" but provided no other details.

¶ 11    Following the testimony, the circuit judge stated as follows:

"We're looking under Illinois Rules of Evidence number 804 that indicates a witness is unavailable if the proponent of the statement has been unable to procure the declarant's attendance by process or other reasonable means.

So the real question here is whether or not the State has made good faith efforts to present Mr. Collins as a witness at trial here. Is there something somebody could always do more? I suppose there is. I suppose the deputy—the officer could have gone back to Davenport recently, but he went there once. There is no such thing as a national database. He's really not a missing person. I think he could best be described as Officer Christian indicated, he's somebody who didn't want to be found.

I'm not sure how effective putting it on this board was when it was really just local, but he did contact law enforcement in the Davenport, Iowa, area, and they hadn't had any contact with him in a number of years. I don't know who he spoke to, but the witness did indicate that everybody he had spoken to, nobody knew the whereabouts. And although it doesn't—at first blush, it sounded like attorney-client information, Ms. Alferink [(assistant state's attorney)] clarified that it appeared that Mr. Chatman made some statements to other individuals indicating that he believes that Mr. Collins is—cannot be found even by the defense. I don't know if that's true or not. But the real question is whether or not the State has used good faith efforts and used reasonable means and effort. And based on the totality of the circumstances here, the Court is going to make that finding. And, therefore, the Court is going to show that the State has tried to get Mr. Collins' attendance by process or

other reasonable means. They've used good faith effort. They've been unable to do so. And, therefore, the statements will be admissible."

¶ 12    Prior to the start of defendant's trial in September 2021, the circuit court held a second hearing on the State's efforts to locate Collins. Detective Christian testified that the I-Board posting regarding Collins had been viewed more than 250 times since the last posting. In August 2021, Christian researched various databases in search of a recent address for Collins. He and another police detective went to an address of an apartment complex on Green Street in Champaign, but there appeared to be no one inside. They also went to a house on Springfield Avenue in Champaign that Collins had used in 2018, but Christian said the house appeared to be vacant and no one answered the door. Christian stated he went to the residence of Collins's brother, Devonte McCormick, on Dale Drive in Champaign but, although there were vehicles in the driveway and Christian suspected people were inside, no one answered the door.

¶ 13    Christian stated he traveled out of state to a home linked to Collins but there was no one inside, and Christian had no reason to think Collins lived there any longer. Christian also stated he and a detective traveled to Kendall County to check two addresses linked to Collins, but they received no answer at either location.

¶ 14    On cross-examination, Christian testified no warrants had been issued for Collins and no request had been put into LEADS to find him. The last time Christian dialed Collins's phone number, he heard a voice he did not recognize, and the man said he had the wrong number.

¶ 15    Following arguments, the circuit judge stated as follows:

"Well, the Court has already found that there was forfeiture by wrongdoing. The issue now is whether or not the State has made reasonable efforts to show that Mr. Collins is unavailable. I did find that back in May. And now I've heard more testimony about what efforts have been made since this time. And Mr. Nolan [(defense counsel)] argues that it was a half-hearted attempt that they knocked on a door and heard some noise and left, and that's true. But most of the other arguments that Mr. Nolan makes really are not persuasive.

In terms of putting someone into LEADS for statewide. I heard the testimony that you would need a warrant, and there's no warrant, and so it would not be allowed into LEADS. He's *** unaware of the database for the FBI and how that has to be done. And, in fact, Ms. Alferink just indicated here that although she did get a warrant for several other witnesses, that's because they had been served with a subpoena and Mr. Collins had not.

What I did hear is that there has been continued effort to put this person on the iBoard, which of course is more locally centralized. But if you have detectives in our area working on other cases, they may hear nuggets about Mr. Collins, so it is a useful tool, although it is somewhat local. But he did go to a number of addresses. He called some numbers. He went out of state.

He has made in my opinion reasonable efforts. Not perfect efforts. Not all the efforts that could possibly be made, but reasonable efforts. And the State simply has to show this that the witness is unavailable by preponderance of the evidence, which I certainly do find at this time.

Therefore, the Court is going to find reasonable efforts to locate Mr. Collins have failed. He is unavailable. The statements will come in pursuant to the Court's previous order."

¶ 16 The case then proceeded to a jury trial. As the appellate court laid out the testimony and evidence in its opinion, we will summarize only those facts necessary to fully analyze the issues on appeal. The trial testimony established that, on the afternoon before Green's murder, defendant and Simmons planned to steal Green's gun. In the evening, defendant sent Facebook messages to Green inviting him to get together with him and Simmons. The three went to a party before leaving and picking up Kotia Fairman.

¶ 17 Defendant later heard from his mother, who asked them to pick her up at a trailer park. Upon arrival, they saw police in the area, so they parked near the entrance. Earlier, Calvin Wilson, who was dating defendant's mother, had told police about a domestic dispute they had that evening. Wilson told police that defendant might have information and described the car he was in.

¶ 18    Shortly after midnight, police officers saw a car that matched Wilson's description of the one in which defendant had been riding. When officers approached, the driver of the car drove off. The officers eventually found the car parked in the middle of the street. Fairman was walking around the car, but defendant, Green, and Simmons were no longer there. Inside the car, officers found Simmons's identification, defendant's cell phone, and a .357 Magnum revolver.

¶ 19    As officers approached the vehicle, they heard yelling and gunshots in the distance. Another officer responded to a call of shots fired and discovered Green lying in the street. Green, who had been shot in his groin and shoulder, later died at the hospital. A brown left boot was found near Green's body, and a brown right boot was found under a nearby parked car. Forensic testing determined that DNA on the left boot was consistent with defendant's DNA profile.

¶ 20    In the early morning hours, defendant knocked on the door of Alexandrinique Anderson and asked to use her phone. Defendant was barefoot at the time and told her he had come from the trailer park where he had been attacked by "some Mexicans" and had to defend himself.

¶ 21    The video recording of Collins's statement to the police was played for the jury. Collins said that, on the morning after Green's murder, defendant arrived at Collins's brother's home without any socks or shoes. Defendant told Collins that he tried to take Green's gun and run but Green chased him, so defendant turned around and shot him twice. Defendant then ran away.

¶ 22    Police interviewed defendant two days after the murder and again in October 2019. During both interviews, he denied shooting Green. He said he jumped out of the car to run from police, heard shots, ran faster, and lost his shoes. The State's evidence included incriminating statements defendant made during his jailhouse phone calls while he was in custody on the gun possession charge and later on the murder charge.

¶ 23    Defendant also confessed to Dennis Griham while they were housed in the same cellblock of the county jail in February 2020. Griham, who was in prison at the time of defendant's trial, testified defendant stated he and Simmons had called Green and told him they "had a lick, which meant something had come up." They picked up Green, "rolled around for a little while," and wound up at a trailer park.

Defendant told Griham he "tussl[ed]" with Green for the gun and defendant "accidentally shot Mr. Green in the chest twice." Defendant stated he ran, lost one of his boots, and hid.

¶ 24      Defendant testified in his own defense. He claimed the text messages between him and Simmons were not about robbing Green. Instead, he, Simmons, and Green planned to steal guns from Green's friends. When the police attempted to stop their vehicle, the men "started tucking guns under the seat." When their car stopped, defendant grabbed a gun and ran. After defendant and Green stopped running, Green asked for his gun. Defendant wanted to get away from the police first, but Green "got aggressive." Green grabbed him, and defendant tried to get away. When Green continued to grab defendant and put a hand on his shoulder, defendant tried to run and then shot him. With Green still on him, defendant fired again. Defendant then ran and hid under a car.

¶ 25      Defendant stated he never went to Devonte McCormick's house and never saw Collins on the morning after the shooting. Defendant also testified that Griham asked a lot of questions about his case but twisted his words and "made up his own little story."

¶ 26      The jury found defendant guilty of felony murder. 720 ILCS 5/9-1(a)(3) (West 2018). Thereafter, defendant filed a motion for acquittal or, in the alternative, for a new trial, arguing *inter alia* that the State did not meet its burden of proving forfeiture by wrongdoing to admit Collins's statement. The circuit court denied the motion and sentenced defendant to 55 years in prison.

¶ 27      Defendant appealed, arguing the circuit court erred in finding the State made reasonable, good-faith efforts to procure Collins's attendance at trial. 2022 IL App (4th) 210716, ¶ 46. Initially, the Fourth District agreed with defendant that the State is required, in the context of Rule 804(a)(5) (Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011)), to show that reasonable, good-faith efforts were made to procure a witness's attendance. 2022 IL App (4th) 210716, ¶ 54. The appellate court went on, however, to find the State's efforts to locate Collins were reasonable and thus the circuit court's similar finding was not against the manifest weight of the evidence. *Id.* ¶ 64. The Fourth District affirmed the circuit court's judgment. *Id.* ¶ 73.

¶ 28     In November 2022, defendant petitioned this court for leave to appeal, and we allowed that petition. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 29                                              ANALYSIS

¶ 30     Defendant raises three issues on appeal. First, he argues this court should adopt the Fourth District's holding that, when seeking to introduce hearsay statements under the forfeiture by wrongdoing exception, the State must demonstrate its good-faith efforts to procure a witness's attendance where the witness is allegedly unavailable due to the opposing party's wrongdoing. Second, he argues the State failed to show good-faith efforts in securing Collins's presence at trial. Third, he argues the circuit court's error in admitting Collins's statement violated his constitutional right to confront a witness against him and that the error was not harmless beyond a reasonable doubt.

¶ 31                               I. Forfeiture by Wrongdoing

¶ 32     The common-law doctrine of forfeiture by wrongdoing serves both as an exception to the hearsay rule and to the confrontation clause of the sixth amendment. *People v. Hanson*, 238 Ill. 2d 74, 96-97 (2010); *Crawford v. Washington*, 541 U.S. 36, 62 (2004). The doctrine is codified in Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011) and Federal Rule of Evidence 804(b)(6). *People v. Peterson*, 2017 IL 120331, ¶¶ 18-19.

¶ 33     Ordinarily, the rule against hearsay would prohibit the introduction at trial of out-of-court statements offered to prove the truth of the matter asserted. *Id.* ¶ 17. However, the forfeiture by wrongdoing exception in Rule 804(b)(5) provides that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011).

¶ 34     As the proponent of the hearsay here, the State had the burden of proving by a preponderance of the evidence that defendant engaged in wrongdoing that was intended to, and did, procure Collins's unavailability. *Peterson*, 2017 IL 120331,

¶ 39. Where the circuit court makes a finding by a preponderance of the evidence, that finding will only be reversed if it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence where 'the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' " *Id.* (quoting *People v. Deleon*, 227 Ill. 2d 322, 332 (2008)).

¶ 35 In this case, defendant does not challenge the circuit court's finding that he engaged or acquiesced in wrongdoing to prevent Collins from testifying. Instead, his arguments center on Collins's unavailability and his belief that the State was required to demonstrate good-faith efforts to procure Collins's attendance at trial.

¶ 36 For the forfeiture by wrongdoing exception to apply, the declarant must be unavailable. Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). Rule 804(a) defines "unavailability as a witness" and lists five situations in which a witness may be found to be unavailable. Ill. R. Evid. 804(a) (eff. Jan. 1, 2011). Here, only one scenario applies—where the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance *** by process or other reasonable means." Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011).

¶ 37 Illinois Rule of Evidence 804 is modeled after Federal Rule of Evidence 804, and this court may look to federal law as guidance in determining the State's obligations in seeking to introduce the statements of an unavailable witness. See *People v. Thompson*, 2016 IL 118667, ¶ 40. In analyzing an exception to the confrontation clause, the United States Supreme Court has stated a declarant is not unavailable " 'unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' " (Emphasis in original.) *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (quoting *Barber v. Page*, 390 U.S. 719, 725 (1968)).

¶ 38 In the appellate court, the State relied on *People v. Golden*, 2021 IL App (2d) 200207, in arguing the prosecutor need not make good-faith efforts to secure a witness's testimony if the statements are being admitted under Rule 804(b)(5). In *Golden*, the defendant had argued Rule 804(b)(5) included the requirement under Rule 804(a)(5) "that the proponent of the hearsay statement demonstrate an inability to procure the declarant's attendance by process or other reasonable means." *Id.* ¶ 70. The Second District disagreed and stated as follows:

"Rule 804 governs exceptions to the rule against hearsay where the declarant is unavailable. Ill. R. Evid. 804 (eff. Jan. 1, 2011). Rule 804(a)(5) expressly encompasses situations in which the declarant 'is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.' Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011). By its very terms, then, Rule 804(a)(5) does not apply to the doctrine of forfeiture by wrongdoing as codified in Rule 804(b)(5)." *Id.* ¶ 71.

¶ 39    In support of its conclusion, the Second District went on to cite this court's decision in *Peterson*, which stated Rule 804(b)(5) " 'identifies only two criteria or factors that must be satisfied for the admission of hearsay statements under the rule:' wrongdoing on the part of the defendant and evidence that the wrongdoing was committed with the intent to, and did, render the witness unavailable to testify." *Id.* ¶ 72 (quoting *Peterson*, 2017 IL 120331, ¶ 32). The court also cited *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 98, which found Rule 804(b)(5) only has those same two factors that must be satisfied. *Golden*, 2021 IL App (2d) 200207, ¶ 72. The Second District believed this interpretation of Rule 804(b)(5) "does not require the State to demonstrate in any particular manner that the witness was unavailable despite its best efforts to procure the witness's attendance." *Id.*

¶ 40    The Fourth District in this case disagreed with *Golden* as it related to the plain language of Rule 804(a)(5). 2022 IL App (4th) 210716, ¶ 51. In looking at Rule 804(a), the appellate court stated "subdivision (a)(5) applies to subdivisions (b)(1) and (5) when the declarant's attendance cannot be procured and to subdivisions (b)(2), (3), and (4) when either the declarant's attendance or testimony cannot be procured" as those subdivisions apply to dying declarations, statements against interest, and statements of personal or family history. *Id.* ¶ 51 & n.2. Thus, the court concluded Rule 804(a)(5) applied to the doctrine of forfeiture by wrongdoing. *Id.* ¶ 51.

¶ 41    The Fourth District also rejected *Golden*'s reliance on *Peterson* and *Zimmerman*, stating neither addressed the interaction between subdivisions (a)(5) and (b)(5) of Rule 804. *Id.* ¶ 52. "*Peterson* addressed whether additional *indicia* of reliability were required to introduce a hearsay statement where the defendant

- 11 -

procured the declarant's unavailability by killing them and *Zimmerman* addressed what types of statements were admissible under Rule 804(b)(5)." *Id.* The Fourth District held that, "because a witness must be unavailable as a prerequisite to forfeiture by wrongdoing, it falls on the proponent of the statement to demonstrate unavailability by a preponderance of the evidence in some manner under Rule 804(a)." *Id.* ¶ 53.

¶ 42 As the State contended Collins could not be located and thus could not be served or otherwise compelled to come to court, the Fourth District found it fell "within the purview of Rule 804(a)(5) and require[d] the State to show that good-faith reasonable efforts were made to procure the witnesses' attendance by a preponderance of the evidence." *Id.* ¶ 54.

¶ 43 We note the State here has abandoned any reliance on *Golden* and does not cite the opinion in its brief to this court. Even if it did, on the issue of the State's obligations under Rule 804(a)(5) and (b)(5), we find the Fourth District's reasoning is correct. The plain language of Rule 804(b)(5) requires the unavailability of a witness, and Rule 804(a) defines unavailability. When considering a witness's unavailability in the confrontation clause context, this court has required the State to " 'either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' " *People v. Torres*, 2012 IL 111302, ¶ 54 (quoting *People v. Bowen*, 183 Ill. 2d 103, 118 (1998)); see also *Roberts*, 448 U.S. at 74 (stating a witness is not unavailable under the sixth amendment unless the prosecutor has made good-faith efforts to obtain his presence at trial). The same applies when the State seeks to introduce hearsay statements under the forfeiture by wrongdoing exception.

¶ 44 Accordingly, we hold that, when the State seeks to introduce hearsay under this exception, the State must demonstrate that the witness is unavailable and that reasonable, good-faith efforts were made to procure the witness's attendance by a preponderance of the evidence. To the extent *Golden* holds the proponent of statements of an unavailable witness under Rule 804(b)(5) need not demonstrate good-faith efforts in securing that witness's attendance at trial, that portion of the opinion is hereby overruled.

¶ 45                                  II. Reasonable, Good-Faith Efforts

¶ 46        Now that we have found, as did the Fourth District, that the State is required to demonstrate good-faith efforts in securing Collins's attendance at trial, we turn next to the question of whether the efforts made in this case were reasonable.

¶ 47        In defining the good-faith requirement, several general propositions have emerged, namely:

> " 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.' " (Emphasis in original.) *Torres*, 2012 IL 111302, ¶ 54 (quoting *Roberts*, 448 U.S. at 74-75).

¶ 48        "[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence [citation], but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Hardy v. Cross*, 565 U.S. 65, 71-72 (2011) (*per curiam*). Moreover, a good-faith effort "is not an ends-of-the-earth effort." *United States v. Chun Ya Cheung*, 350 Fed. App'x 19, 23 (6th Cir. 2009). "Whether good-faith and reasonable diligence have been exercised is determined on a case-by-case basis after a careful review of the facts and circumstances." *People v. Smith*, 275 Ill. App. 3d 207, 215 (1995).

¶ 49        In this case, Collins received numerous threats from defendant's family and friends and, as a result, fled to Iowa in February 2020. He initially met with detectives in Iowa in March 2020, and nothing indicated he planned on not cooperating with police or intended to move elsewhere. However, he eventually stopped responding, and his whereabouts became unknown.

- 13 -

¶ 50    Detective Christian testified that, when he last attempted to call Collins's phone number, he did not recognize the voice of the person who answered and that person said he had the wrong number. In his attempts to find Collins, Christian posted Collins's information on the I-Board in February 2021, alerting local law-enforcement agencies and officers. He reposted the information in April and May 2021. Although the posting was viewed hundreds of times, Christian did not receive any responses. He also contacted law-enforcement officers in Davenport, Iowa, but they had no contact with Collins.

¶ 51    In August 2021, Christian also researched various databases to try to locate a recent address for Collins. After doing so, he and another detective attempted to make contact at an apartment complex on Green Street in Champaign, but no one appeared to be inside. They went to Collins's former address on Springfield Avenue in Champaign, but it appeared no one lived at the house. They went to the residence of Collins's brother on Dale Drive in Champaign, but although Christian suspected people were inside, no one answered the door. Detectives traveled to an address in Iowa, but no one was at the house. They also tried two addresses in Kendall County without success.

¶ 52    Christian served a subpoena in Aurora on defendant's mother, who was related to Collins, and she stated she had no contact with Collins. None of defendant's other family members provided any information on Collins's whereabouts. Defendant's jailhouse phone calls indicated that he and his counsel had been unable to locate Collins.

¶ 53    From all accounts, Collins did not want to be found. Notwithstanding that fact, Detective Christian utilized the information available to him in an ongoing attempt to find him. Through the I-Board postings, the phone call to Collins's last known number, and the visits to multiple addresses in different counties and different states, Christian made good-faith efforts to locate Collins without success. While the State's efforts might not be considered extraordinary, the question here is whether the efforts to locate Collins were reasonable. We find that they were.

¶ 54    Defendant, however, argues more could have been done. Specifically, defendant argues the State could have mailed subpoenas to the addresses Collins was affiliated with, Collins could have been listed as a missing person in LEADS,

and Collins's phone records could have been subpoenaed to help learn his whereabouts.

¶ 55    We find the success of the proposed actions speculative at best. As to the mailing of a subpoena, there is no indication that Collins was living at any of the addresses Christian visited, and thus any such attempt at mailing the subpoena would most likely have been futile. Christian also testified he could not place Collins's information in LEADS because he had not been served with a subpoena. A missing person can be placed into LEADS when there is a reasonable concern for that person's safety, but it requires a "missing person report," and Collins was not so much missing as he was intentionally not wanting to be found. See LEADS 3.0 Manual, Ill. State Police (Apr. 25, 2022), https://isp.illinois.gov/Law Enforcement/LEADS3Manual [https://perma.cc/HT2W-94JV]. Lastly, subpoenaing Collins's phone records would not guarantee finding him, given his clear intention not to be discovered. See *Roberts*, 448 U.S. at 76 (noting "the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution").

¶ 56    Defendant also cites several cases that he contends show what reasonable, good-faith efforts look like and how they, when compared to this case, prove the State's efforts were deficient. See *e.g.*, *United States v. Smith*, 928 F.3d 1215 (11th Cir. 2019); *People v. Payne*, 30 Ill. App. 3d 624 (1975). However, these cases and others like them deal with facts that are distinguishable from those of the case before us. Moreover, the reasonableness of the State's efforts depends on an analysis of the specific facts of each individual case, eschewing a rigid case-by-case comparison. See *United States v. Banks*, 540 U.S. 31, 36 (2003) (treating "reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case"); *Smith*, 928 F.3d at 1228 (noting "there is no brightline rule for reasonableness" and "a reasonableness inquiry necessarily is fact-specific and examines the totality of the factual circumstances of each particular case").

¶ 57    While "[o]ne, in hindsight, may always think of other things" (*Roberts*, 448 U.S. at 75), nothing indicates Christian learned of tips or leads about Collins's whereabouts and failed to follow up on them. Although the State's efforts in

locating Collins failed to bear fruit, they were in the end reasonable. Given the totality of the facts and circumstances here, the circuit court's finding that the State made reasonable, good-faith efforts to locate Collins was not against the manifest weight of the evidence.

¶ 58    As we find no error in the admission of Collins's statements, we need not address defendant's final claim that the introduction of the statements violated his right to confront a witness against him.

¶ 59                                   CONCLUSION

¶ 60    For the foregoing reasons, we affirm the appellate court's judgment, which affirmed the judgment of the circuit court.

¶ 61    Judgments affirmed.