2024 IL App (1st) 240308-U

No. 1-24-0308B

Order filed April 30, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20 CR 5833 |
| DEVANTE YORK, | ) ) | Honorable Maria Kuriakos Ciesil, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford concurred in the judgment.
Justice Ocasio specially concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's order granting the State's petition for detention affirmed where the court's findings that the State proved by clear and convincing evidence that the proof is evident or the presumption great that York committed an eligible offense, that he poses a real and present threat to public safety, and that no conditions of release would mitigate that threat was not against the manifest weight of the evidence.

¶ 2    Defendant Devante York appeals the circuit court's order granting the State's petition for pretrial detention, pursuant to Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023). York was arrested and charged prior to the effective date of Public Act 101-652 (eff. Jan. 1, 2023), commonly

known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act (Act).[1] On January 18, 2024, York filed a petition seeking pretrial release in accordance with the new statutory standards. In response, the State filed a verified petition for pretrial detention. Following a hearing, the circuit court denied York's petition and ordered York to remain detained. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        York was charged with first degree murder in May 2020, for a November 2019 shooting of a 53-year-old woman.[2] He was ordered held "no bail" following a bond hearing. In June 2020, the case was superseded by indictment. A motion for bail reduction was denied on September 22, 2020, and York has since remained in pretrial custody.

¶ 5        York filed a "Petition to Grant Pretrial Release" on January 18, 2024, noting that he had been in custody for 1,326 days and would be amenable to any combination of electronic monitoring (EM) or GPS monitoring if he were released. Even though York was in custody, the State filed a responsive verified petition to deny pretrial release, pursuant to sections 5/110-2 and 5/110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-2, 110-6.1 (West 2022)). The petition alleged that York committed an eligible offense (first degree murder) as listed in Section 5/110-6.1(a)(1.5) of the Code, and that he "poses a real and present threat to the safety of any person or persons in the community." Specifically, the State relayed that:

¶ 6               "On November 6, 2019, [York] and six co-offenders met up on the west side of the
                  Altgeld Gardens all armed with firearms. [York] and his co-offenders moved in

---

[1] "The Act has also sometimes been referred to in the press as the Pretrial Fairness Act. Neither name is official, as neither appears in the Illinois Compiled Statutes or public act." *Rowe v. Raoul*, 2023 IL 129248, ¶ 4 n. 1. *Raoul* lifted the stay of pretrial release provisions and set an effective date of September 18, 2023. *Id.* ¶ 52; Pub. Acts 101-652, § 10-255, 102 1104, § 70 (eff. Jan. 1, 2023).

[2] Throughout the record, the victim is referred to interchangeably as either 53 or 54 years old. For ease of clarity, we will use 53 throughout the order.

coordinated fashion through rival gang territory to the east side of the complex at a time taking up positions and aiming their weapons at various locations. Upon arriving on the east side of the complex, [York] and his co-offenders encountered 53 year old Kimberly Underwood driving in a parking lot as she returned home. Co-defendant Jay York walked up to the car and fired multiple shots into the car. [York] also fired toward Ms. Underwood's car along with a third co-offender. Kimberly Underwood was killed as a result of these actions."

¶ 7    The court conducted a hearing on the petitions on January 24, 2024. In support of York's motion, defense counsel argued that 31-year-old York, 27 years of age at the time of the offense, was born and raised in Altgeld Gardens. York is a high school graduate, has earned an associate degree, and was enrolled for his bachelor's degree at his time of arrest. He played basketball in college, in the City Pro-Ams, and the ABA. At the time of the offense, he was living with his girlfriend, and he has family in the area. Counsel argued that York would thrive on release, obeying any court orders, and could be on EM in a safe, appropriate place.

¶ 8    The State proceeded on their petition by proffer, arguing that the proof is evident, or the presumption great that York committed the forcible felony of first degree murder on November 6, 2019, at approximately 10:24 p.m. Shortly before the shooting occurred, York, co-defendant Jay York[3], co-defendant Avion King, and four other uncharged co-offenders gathered near block five of the Altgeld Gardens. This area of the Altgeld Gardens is controlled by the Gangster Disciples, and more specifically, a faction known as the Barnone GDs. Surveillance cameras from within the Altgeld Gardens allowed officers to track York and his co-offenders—all either members of the Barnone faction or closely connected to other Barnone members—as they moved in coordinated

---

[3]To avoid confusion, we will refer to defendant's brother Jay York as "Jay."

fashion from the west side of the Altgeld Gardens to block nine on the east side of the Altgeld Gardens. Block nine is the territory of the Duffle Bag Gang, or Take Some Gang, a faction of the rival gang the Black Disciples.

¶ 9    York and his six co-offenders can be seen on video surveillance, all armed with weapons. York brandishes a semiautomatic handgun and is clothed in a distinctive Puma jacket with white lettering on the left chest and sleeve. Co-defendant King is armed with an AK-style rifle, while another uncharged co-offender is seen with a weapon equipped with a red laser sight. As the offenders move in a coordinated fashion through the Altgeld Gardens toward the rival gang territory, they can be seen at times separating into groups, signaling to each other via hand gestures, taking up various positions, and aiming their weapons at various locations.

¶ 10    York and his co-offenders encounter no one until they arrive at block nine at 1023 East 132nd Street. As they arrive, the 53-year-old victim is arriving home to the same block, driving in an adjacent parking lot. Jay emerges from the nearby courtyard, walks to within feet of the victim's vehicle, and fires multiple shots into the car. York is then captured on video firing his weapon towards the victim's vehicle, with the muzzle flashes apparent. Another co-offender fires as well. The victim was shot and killed as a result of this gunfire.

¶ 11    The offenders then flee from the scene of the murder to various locations in and round the Altgeld Gardens. York can be seen on his cell phone at 10:29 p.m., during his flight to a residence on the west side of the Altgeld Gardens. York is then seen leaving the address in the same gray Jeep he arrived in. York's face, facial hair, hairstyle, Puma jacket, and firearm are captured on the video as he walks through basketball courts in the Altgeld Gardens. A Chicago Police officer assigned to the Area South Gang Investigation Unit was subsequently able to identify York from the videos. As was a witness who has known York since childhood.

¶ 12    Subsequently, on December 28, 2019, York was arrested and charged with aggravated

unlawful use of a weapon (AUUW). A police officer's body worn camera from that incident demonstrates that York was the driver of a gray Jeep consistent with the jeep in the video from the Altgeld Gardens. York was wearing the same distinctive Puma jacket. Police officers additionally obtained video of a rap performance York posted on YouTube where he is wearing the same Puma jacket. After a search warrant was obtained for the provider of the iPhone York was in possession of at the time of his arrest, historical cell tower records revealed that there was activity on his phone consistent with him being in the vicinity of the Altgeld Gardens at the time of the murder.

¶ 13    Aside from the instant charges and the December 2019 AUUW charge, York has no prior criminal background. The State contended York is a real and present threat to the community, based on the way he and his codefendants "move together in a coordinated fashion. The inference is clear based on the video and their actions of moving together in pairs of two and taking of positions, aiming at different locations, that this was coordinated and that they were looking for targets or rival gang members." Additionally, the murder victim had no gang affiliation and was simply trying to return home. Accordingly, the State argued that York should be detained because the level of coordination and random violence in this case substantiates that no condition could mitigate the risk York poses. The State then expounded further on why EM and other conditions are inappropriate in this case.

¶ 14    Defense counsel countered that a sheriff's officer in Division nine of the jail had provided a letter indicating that York is able to follow rules and regulations. Counsel relied on the fact that Jay was the individual who fired directly into the victim's vehicle.

¶ 15    The court granted the State's petition for pretrial detention, specifically noting that the State alleged a coordinated effort between gang members who were caught on video entering "rival territory" and seeking out enemies while all armed with guns. The court took note that York was identified using video surveillance, phone records, and from his vehicle. Moreover, the court stated

that the victim was a woman in her mid-fifties, with no gang affiliation, who was shot several times while in her vehicle. Last, although Jay was the first one seen firing on the video, York also fired in the victim's direction. Accordingly, the court found York a danger to society and denied his request for release, instead granting the State's detention petition.

¶ 16    The court entered a written detention order using a template form that lists the requisite three propositions preprinted on the form—(1) the proof is evident or the presumption great that the defendant has committed a detention eligible offense, (2) the defendant poses a real and present threat to the safety of any person(s) or the community, based on the specific articulable facts of the case, and (3) no condition or combination of conditions of release can mitigate that threat. On lines provided below each proposition, the court wrote specific facts from the case that it relied upon to reach its findings. Beside the preprinted finding for the first proposition, the court wrote, "First Degree Murder; he shot and killed, on 11/6/19, 10:24 p.m., at Altgeld Gardens, Kimberly Underwood, who was 53 years old." For the second proposition, the court wrote:

"he, along with several individuals, some of whom are uncharged, committed the crime. Video software tracked the gang members of Bar None G.D.s, which [York] is a member of, acted together to perform the murder. [York]was identified in the video, seven total, and armed with handguns, moved together, thru rival gang territory, shot and killed the victim; the victim was shot several times towards [*sic*] along with [York]. The victim has no gang affiliation."

For the third proposition, the court wrote: "[York], along with co-offenders fled the scene in multiple vehicles. [York] was arrested on an unrelated gun case two months later. Historical cell phone analysis of [York's] phone is consistent with [York] being in the vicinity of the murder." The order indicates that York is to be detained pending trial.

¶ 17    York filed a timely notice of appeal on February 5, 2024.

¶ 18                                   II. ANALYSIS

¶ 19        On appeal, the Office of the State Appellate Defender filed a notice in lieu of a memorandum, choosing instead to stand on the arguments York made in his notice of appeal. Utilizing the approved form from the Article VI Forms Appendix to the Illinois Supreme Court Rules (see Ill. S. Ct. Rs. Art. VI Forms Appendix R. 604(h)), York's claim of error consisted of four claims. While York failed to specifically check any of the boxes next to the various arguments, he did provide additional explanation beneath the claims where the boxes would have been checked. Accordingly, we can presume York is arguing: (1) the State failed to prove by clear and convincing evidence that the proof is evident or the presumption great that he committed the offenses charged; (2) the State failed to prove by clear and convincing evidence that he poses a real and present threat to the safety of any person(s) or the community; (3) the State failed to prove by clear and convincing evidence that no condition or combination of conditions can mitigate the real and present threat he poses; and (4) the court erred in its determination that no conditions would reasonably ensure his appearance for later hearings or prevent him from being charged with a subsequent felony or Class A misdemeanor. More specific arguments were supplied in the blank spaces below these preprinted assertions.

¶ 20        As further support, York argues that the State failed to meet its burden to prove that he committed the charged offense where the State argued that co-defendant Jay fired into the vehicle while York only shot a weapon toward the vehicle. York contends the State failed to prove he poses a threat where he has no criminal background and no propensity for violent behavior. He claims the State failed to prove that no conditions can mitigate any threat he may pose where EM would restrict his movements while allowing him to be with his family while he awaits trial. Lastly, York argues the court failed to explain in its order why conditions such as EM would not ensure his appearance at later hearings while preventing him from committing further crimes, "as he

would be confined to his home."

¶ 21    The State did not file a responsive memorandum. In considering this appeal, this court has reviewed the following documents which York has submitted under Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023): (1) York's notice of appeal pursuant to the Act and (2) the supporting record.

¶ 22    "Pretrial release is governed by section 110 of the Code as amended by the Act." *People v. Morales*, 2023 IL App (2d) 230334, ¶ 4 (citing 725 ILCS 5/110-1 et seq. (West 2022)). Pursuant to the Code, "it is presumed that a defendant is entitled to release on personal recognizance on the condition that the defendant shall attend all required court proceedings and the defendant does not commit any criminal offense, and complies with all terms of pretrial release." 725 ILCS 5/110-2(a) (West 2022). Under the Code, all persons charged with an offense are eligible for pretrial release before conviction. *Id.* The court may deny pretrial release upon a verified petition by the State and following a hearing. 725 ILCS 5/110-6.1(a) (West 2022). It is the State's burden to prove by clear and convincing evidence that (1) the presumption is great or the proof evident that the defendant committed a detainable offense, (2) the defendant poses a real and present threat to the safety of any person(s) or the community, based on the specific and articulable facts of the case, and (3) no condition or combination of conditions can mitigate the threat the defendant poses, or prevent the defendant's willful flight from prosecution. 725 ILCS 5/110-6.1(e)(1)-(3) (West 2022). The standard "requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004).

¶ 23    If the court determines that the State has met its burden and the defendant should be denied pretrial release, the court is required to make a written finding summarizing the reasons for denying pretrial release. *Id.* § 6.1(h)(1). If the court finds that detention is not appropriate, it can impose additional conditions if it determines such conditions:

"are necessary to ensure the defendant's appearance in court, ensure the defendant does not commit any criminal offense, ensure the defendant complies with all conditions of pretrial release, prevent the defendant's unlawful interference with the orderly administration of justice, or ensure compliance with the rules and procedures of problem solving courts." 725 ILCS 5/110-10(b) (West 2022).

¶ 24 Before reaching the merits of York's appeal, we recognize that the statute is unclear regarding the proper procedure to be taken in a case such as this—where a defendant is held no bail prior to the Act, the defendant remains detained through pretrial pendency, the defendant files a petition for release following the effective date of the Act, the State files a responsive verified petition for detention, and the defendant is simultaneously afforded a hearing on both petitions. In the instant case, York was arrested in December 2019, prior to the effective date of the Act (see *Rowe*, 2023 IL 129248, ¶ 52), for, *inter alia*, first degree murder. He was denied bail and has remained in custody ever since. Four years later, York chose to file a petition to reconsider pretrial release conditions—or a "Petition for Pretrial Release," as he termed it—to avail himself of the "new statutory standards."

¶ 25 When we interpret a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Hernandez v. Lifeline Ambulance, LLC*, 2020 IL 124610. The best indication of the legislature's intent is the plain language of the statute itself. *Id*. When the language of the statute is clear and unambiguous, we must apply it as written, *id.*, without resorting to further aids of statutory construction. *Cothron v. White Castle System, Inc.*, 2023 IL 128004, ¶ 20. According to well-established principles of statutory interpretation, we must construe a statute so that all the language used in the statute is given effect and so that no word, clause, or sentence is "rendered meaningless, superfluous or insignificant." (Internal quotation marks omitted.) *People v. Jones*, 397 Ill. App. 3d 651, 657 (1st Dist. 2009). *See also Blum v. Kostner*, 235 Ill. 2d 21, 44 (2009) ("we

construe the statute to avoid rendering any part meaningless or superfluous"); *Crawford Supply Co. v. Schwartz*, 396 Ill. App. 3d 111, 117 (1st Dist. 2009).

¶ 26    Section 110-7.5 of the Code provides guidance regarding individuals who were arrested prior to the effective date of the Act and separates those individuals into three categories. 725 ILCS 5/110-7.5 (West 2022). The first category is comprised of any defendant released subject to pretrial conditions prior to the Act's effective date. *Id.* § 110-7.5(a). The second category is comprised of any defendant remaining in pretrial detention after having been ordered released with pretrial conditions, including the condition of depositing monetary security. *Id*. § 110-7.5(b). Last, the third category is comprised of "any person, not subject to subsection (b), who remains in pretrial detention and is eligible for detention under Section 110-6.1." *Id*.

¶ 27    York falls into the third category, as an individual who was ordered held "no bail" prior to the Act's effective date. Section 5/110-7.5(b)(1) specifically states that such defendants "charged with offenses under paragraphs (1) through (7) of subsection (a) of Section 110-6.1 [shall be entitled to a hearing] within 90 days of the person's motion for reconsideration of pretrial release conditions." *Id*. § 110-7.5(b)(1). However, the statute does not specify what *type* of hearing such defendants are entitled to. While section 5/110-7.5(b) explains that the second category of defendants "shall be entitled to a hearing under subsection (e) of Section 110-5," the third category is specifically comprised of those defendants "not subject to subsection (b)," despite the third category itself being defined within subsection 5/110-7.5(b).

¶ 28    Although both parties and the trial court operated under the assumption that York was entitled to a new detention hearing pursuant to section 5/110-6.1 of the Code, it would appear from the statute's plain language that it does not contemplate a new detention hearing for defendants such as York—those arrested prior to the Act, who were previously detained by the court following a bond hearing. Instead, it would appear that such similarly situated defendants are entitled to a

hearing to reconsider pretrial release conditions—arguably a hearing more akin to that contemplated in section 5/110-5(e) of the Code, a hearing to determine continued detention. Despite the apparent incongruity in the statute, we need not conclusively settle what type of hearing was proper in light of York's filing, where we would affirm the court's ruling under the standard for either hearing (that for continued detention[4] or the more onerous burden at a hearing for detention upon the State's verified petition).

¶ 29    We now turn to the hearing that was held on January 24, 2024. There has been considerable disagreement amongst the appellate court as to which standard of review applies to pretrial release orders. See *People v. Lee*, 2023 IL App (1st) 232137, ¶ 21 (observing split regarding abuse of discretion, manifest weight of the evidence, and *de novo* standard under the Act). Here we need not opine on the proper standard of review, where the result of this case would be the same under any standard.

¶ 30    For the following reasons, we do not believe the trial court's findings that the State proved by clear and convincing evidence that the proof is evident or the presumption great that York committed an eligible offense, that he poses a real and present threat to the community, and that there were no conditions that could mitigate that threat were against the manifest weight of the evidence. Further, the court did not abuse its discretion in determining that no less restrictive conditions can mitigate York's real and present threat to the community based on the specific articulable facts of this case.

¶ 31    York first argues that the State failed to meet its burden of showing, by clear and

---

[4]At subsequent appearances after denial of pretrial release, the State maintains the burden to demonstrate that continued detention is necessary. *People v. Starks*, 2024 IL App (1st) 232022-U, ¶ 29. "[T]he State must set forth a factual basis to support continued detention and the court must base its finding on the specific articulable facts of the case," but "the court is required to make findings as to whether less restrictive conditions of release could be utilized." *Id.*, ¶ 29, ¶ 38.

convincing evidence, that he committed the charged offense where the State's proffer signified that co-defendant Jay fired his weapon into the victim's vehicle, while York simply fired a weapon toward the vehicle. We are unpersuaded by York's argument. The State's proffer clearly indicated that the instant offenses were largely captured on surveillance video, with clear footage of York. York does not argue that he is not the individual captured on video. York's face, facial hair, and hairstyle is clearly seen on video as he meets with his co-offenders on the west side of the Altgeld Gardens. With a brandished semiautomatic handgun and wearing a Puma brand jacket with distinctive lettering on the left chest and sleeve, York systematically moved with the group towards rival gang territory on the east side of the Altgeld Gardens, block nine. Footage shows the victim driving her vehicle in a parking lot adjacent to block nine, when co-defendant Jay is seen emerging from the nearby courtyard, walking within feet of the vehicle, and firing multiple times into the vehicle. York is then captured firing his weapon towards the victim's vehicle; the muzzle flashes emitting from the firearm can be seen on video. Next, York is captured fleeing the scene and arriving back to a residence on the west side of the Altgeld Gardens, where he is seen on his cellular phone. A Chicago Police Officer and a witness, both familiar with York, identified him from the video. Additionally, York is seen on an officer's body worn camera two months later, wearing the same distinctive Puma jacket from the Altgeld Gardens surveillance video. Moreover, police detectives obtained video of York's YouTube rap performance where he is wearing the same jacket. There are also historical cell tower records from York's iPhone consistent with him being in the Altgeld Gardens at the time of the murder. Given this plethora of proffered evidence, we cannot say the court's finding that the proof is evident or the presumption great that York committed the offense is unreasonable, arbitrary, or not based on the evidence present. *Chatman*, 2024 IL 129133, ¶ 34.

¶ 32        York also contends the State failed to meet its burden to prove he poses a threat to the

community, where he has no criminal background and no propensity for violent behavior. We disagree that the State failed to prove that York poses a threat to public safety. While evidence was proffered indicating York has no criminal background, this is not tantamount to the claim that he has no propensity for violent behavior. Certainly, the proffered facts of this case indicate a coordinated attack of violence and a disregard for the safety of the community at large. Further, the court was made aware that York was arrested two months after the instant offense, in possession of a firearm; AUUW charges followed that incident. Accordingly, the trial court could reasonably find, based on the State's proffered facts, that York poses a threat to the safety of the community.

¶ 33    York thereafter claims the State failed to prove that no conditions of release can mitigate any threat he may pose, where EM would restrict his movements while allowing him to be with his family while he awaits trial. During its proffer, the State argued that the facts of this case, the level of coordination and the random violence, show that there is no condition other than detention that would mitigate the risk York poses. Specifically, the State argued that EM would be inappropriate for York because defendants on EM are allowed movement on mandatory days. Further, the State noted that those on EM "can't be monitored at all times even when they're supposed to be in their host residence." Finally, the State argued that when looking at the facts of this case in conjunction with the limitations of other conditions, no alternative could be imposed outside of detention. York demonstrated a willingness to commit a coordinated act of random violence. He and six co-offenders were observed on surveillance video brandishing firearms and systematically moving through the Altgeld Gardens looking for rival gang members to shoot. Ultimately, the 53-year-old victim they shot and killed was not affiliated with any gang and was simply returning to her residence. York then fled the scene of the crime, and was arrested two months later, in possession of a firearm and wearing the same jacket from the incident. Moreover,

13

the State explicitly proffered that it did not believe EM was an appropriate condition in this case, where it was not restrictive enough to mitigate the risk York poses, based on all these factors. We find the court's determination that the State met its burden in proving that no lesser conditions could mitigate the threat he poses was not against the manifest weight of the evidence.

¶ 34    Last, York argues the court "gave no reasoning in its order as to why a condition or combination would or would not ensure the appearance of the defendant at later hearings." He asserts that he is not a flight risk, and "if he were placed on electronic home monitoring, he would not be free to commit further crimes, as he would be confined to his home." Notably, the court made no finding to indicate that York is a flight risk, nor did it comment upon his appearance at later hearings. Rather, the court found that "no condition or combination of conditions *** can mitigate the real and present threat to the safety of any person or persons or community based on the specific articulable facts of the case." The court listened both to the State's proffer explaining why it believed EM and other conditions shy of detention are inapplicable in this case, and defense counsel argument in response that she was in possession of a letter from a police officer indicating that York can follow rules and regulations.

¶ 35    In making its oral pronouncement, the court reiterated the specific articulable facts of the case and held that York is a danger to society. Consequently, the court ordered that "the order that was previously entered by two different judges to detain you is to remain." In its written order, the court wrote that, "[York], along with co-offenders fled the scene in multiple vehicles. [York] was arrested on an unrelated gun case two months later. Historical cell phone analysis of [York's] phone is consistent with [York] being in the vicinity of the murder." While greater explanation and additional evidence on this point may be preferable, and even necessary in some instances, the court's written findings here were nevertheless sufficient to comply with statutory authority. See *People v. Brown*, 2024 IL App (2d) 230489, ¶ 18 (finding the court's written order, read in

14

conjunction with the oral pronouncement, sufficient to comply with 725 ILCS 5/110-6.1). We find the facts proffered in this case warrant the court's conclusion.

¶ 36                                    III. CONCLUSION

¶ 37        Following a thorough review of the record on appeal, for the reasons stated, the circuit court's order is affirmed.

¶ 38        Affirmed.

¶ 39    JUSTICE OCASIO, specially concurring:

¶ 40        I would review the order denying pretrial release *de novo*, not deferentially. See *People v. Whitaker*, 2024 IL App (1st) 232009, ¶¶ 79-138 (Ellis, J. concurring). Otherwise, I concur with the court's decision.