2025 IL App (4th) 231504

NO. 4-23-1504

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| FREDERICK DEVON THOMAS, | ) | No. 18CF2508 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court, with opinion.
Justices Steigmann and Vancil concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial in April 2021, defendant, Frederick Devon Thomas, was convicted of two counts of first degree murder for the fatal beating of his girlfriend, Jennifer Lewis. The trial court sentenced defendant to 55 years' imprisonment. Defendant appeals, arguing the admission of Lewis's hearsay statements to law enforcement officers about prior incidents of domestic violence violated the confrontation clause of the United States Constitution (U.S. Const., amend. VI) and the admission of both these and similar statements to acquaintances separately violated the hearsay rule (Ill. R. Evid. 802 (eff. Jan. 1, 2011)). We affirm.

¶ 2                                   I. BACKGROUND

¶ 3                              A. Defendant's Charges

¶ 4     On September 26, 2018, the State charged defendant by bill of indictment with

Lewis's murder. On the State's motion, and in exchange for defendant waiving his right to a jury trial, counts II, III, V, VI, VIII, and IX were dismissed on April 2, 2021. The remaining counts of the indictment alleged the following. Count I alleged that between September 1, 2018, and September 11, 2018, defendant committed the offense of first degree murder in that, without lawful justification and with the intent to kill or do great bodily harm, he struck Lewis multiple times, thereby causing her death (720 ILCS 5/9-1(a)(1) (West 2018)). Count IV alleged that between September 1, 2018, and September 11, 2018, defendant committed the offense of first degree murder in that, without lawful justification and knowing such acts would cause Lewis's death, he struck her multiple times, thereby causing her death. *Id.* Count VII alleged that between September 1, 2018, and September 11, 2018, defendant committed the offense of first degree murder in that, without lawful justification, and knowing such acts created a strong probability of death or great bodily harm to Lewis, he struck her multiple times, thereby causing her death (*id.* § 9-1(a)(2)).

¶ 5                                     B. Pretrial Proceedings

¶ 6                          1. *The State's First Notice of Intent to Introduce Evidence*

*Under the Doctrine of Forfeiture by Wrongdoing*

*and Motion in Limine*

¶ 7            On December 9, 2019, the State filed its first "Notice of Intent to Introduce Evidence Under [the] Doctrine of Forfeiture by Wrongdoing." As pertinent to this appeal, the State explained its intention to admit statements by Lewis to (1) Rockford police Detective Apostolos Sarantopoulos on January 30, 2018, regarding two instances of being beaten by defendant earlier that month; (2) Rockford police officer James Grana on February 2, 2018, about being beaten by defendant the previous day; (3) Shreen Jefferson on September 7, 2018, pertaining to being beaten by defendant; and (4) Yolanda Barkley on September 9, 2018, relating to trying to flee abuse. On

December 19, 2019, the State filed its first motion *in limine* seeking a determination of the admissibility of these statements as evidence of defendant's prior incidents of domestic violence against Lewis for propensity purposes.

¶ 8                    2. *The Hearings on the Initial Pleadings*

¶ 9          On January 29, 2020, the trial court held its initial hearing on the State's "Notice of Intent" and first motion *in limine*. The State asserted the series of statements from Lewis pertaining to being the victim of various acts of violence by defendant "would be covered by forfeiture by wrongdoing." On February 13, 2020, the court held another hearing. The State claimed these statements were admissible, pursuant to the doctrine of forfeiture by wrongdoing, in that Lewis was "unavailable" and defendant "intentionally procured" her unavailability. Defendant's counsel responded there was no evidence suggesting defendant would have murdered Lewis with the intent to keep her from testifying; in particular, nothing suggested "there's a trial upcoming or that you are going to not have to testify and I don't want you to testify, so that's why I committed this murder to prevent you from testifying." The State replied defendant "intended to silence [Lewis] from ever talking to the police or testifying" and the absence of a "pending proceeding" at the time of her murder would not "make[ ] a difference."

¶ 10                    3. *The Hearing on the Amended Pleadings*

¶ 11          On February 21, 2020, the State filed an amended notice of intent and amended first motion *in limine*. At a status hearing the same day, the State informed the trial court the amendments were in the way of correcting the date of the domestic violence incident about which Lewis spoke to Jefferson and "add[ing] a little more information about that particular incident." On September 1, 2020, the court held a hearing on the State's amended pleadings and heard testimony from four witnesses.

¶ 12                           a. Deputy Coroner April Johnson

¶ 13         Winnebago County Deputy Coroner April Johnson testified she reported to the scene of Lewis's death (defendant's apartment in Rockford) on September 11, 2018, and pronounced her deceased at 8:51 a.m. Johnson observed Lewis lying on her back, on the floor of the living room, undressed, and with "a lot of soft tissue injuries to her entire body." After a search warrant was granted, Johnson returned, finding the rod used to open and close the blinds in the apartment "that almost perfectly matched" the injuries on Lewis's body.

¶ 14         At the autopsy, Johnson observed Lewis only had "half of her normal blood volume" and the paleness of her liver and kidneys was consistent with that degree of blood loss. (Johnson observed "blood spatter throughout the entire residence," not "large pools of blood" throughout.) According to Johnson, Lewis's cause of death was "soft tissue injury due to blunt force trauma or multiple traumas *** due to a beating," with cardiomegaly and left ventricular hypertrophy as contributing factors. Lewis had "a laceration to the back of her head" and "an extensive amount of bruising from soft tissue injury" to "her entire back, rear end, [and] back of [her] legs."

¶ 15                           b. Detective John Wassner

¶ 16         Rockford police Detective John Wassner testified he went to defendant's apartment on the morning of September 11, 2018, and was informed that a deceased female was located upstairs. Defendant was present at the scene when other officers arrived and reported he called 911. (Defendant and Lewis were living together, and he admitted "that was in direct violation of his probation and condition of release" in a separate case.) According to Detective Wassner, defendant "said that he was out of town in Chicago and had just returned home and found [Lewis] in the apartment." However, Detective Wassner noticed defendant's vehicle was "cold to the

touch," which was inconsistent with his version of having just returned from Chicago.

¶ 17    Defendant was interviewed by Detective Wassner and Detective Brad Shelton. Defendant "gave several accounts of the night," and "after each account, he would admit to [the detectives] that he had fabricated that account." Defendant eventually admitted he was with Lewis "all night." Defendant "said that they had taken some ecstasy and they were engaging in some sexual activity." Lewis "became out of control for some reason and [defendant] had to try to physically restrain her from flopping around and whatnot." Defendant attributed the presence of blood in the apartment to Lewis "falling" and "bleeding from the head at some point." Defendant found Lewis in the living room the next morning, having asked her if she wanted him to buy her something to eat but noticing "she would not wake up."

¶ 18    c. Sergeant Steve McCorkle

¶ 19    Winnebago County Sheriff's Department Sergeant Steve McCorkle obtained recordings of calls defendant made from the Winnebago County jail. Sergeant McCorkle testified about a call defendant made to Lewis at 1:13 p.m. on February 4, 2018. Defendant said, "Whatever you do, disappear. You know what I mean? You can't cooperate." Lewis responded, "I know that."

¶ 20    d. Detective Apostolos Sarantopoulos

¶ 21    Rockford police Detective Apostolos Sarantopoulos spoke with Lewis on January 30, 2018, regarding two incidents of domestic violence inflicted by defendant—one on January 21, 2018, and the other on January 24, 2018. Regarding the first incident, Lewis reported that after defendant woke up from a nap, "he was in a bad mood or had an attitude *** and he got a two-by-four and hit her in the head with it twice and he swore at her and called her a no good lying b****." Lewis sustained a cut to the top of her head approximately one inch long. Lewis did not want defendant arrested nor did she provide a written statement; "she just wanted to get away from

him." Regarding the second incident, Lewis reported defendant came to his sister's home that day to pick up Lewis (who stayed there the night before). Defendant told Lewis to "get her ass in the back of the truck." Right after they drove away, defendant beat Lewis with a stick, which was two or two and one-half feet in length, until it broke. Detective Sarantopoulos described "severe bruising" on Lewis's body, specifically on at least one arm, her back, and her legs.

¶ 22                                        e. Counsel's Arguments

¶ 23            On September 9, 2020, the trial court heard arguments from the State and defendant's counsel on the admissibility of the statements at issue pursuant to the doctrine of forfeiture by wrongdoing. The State asserted:

> "So our argument is that throughout this entire time, [defendant's] intent was to get [Lewis] not to cooperate and that his intent was to silence her so she couldn't report any of the increasing abuse that was occurring. ***[A]nd that he was intending, by killing her, to make her unavailable to report any of this abuse, any of the increasing abuse that was going on even closer in time."

¶ 24            Defendant's counsel addressed whether the evidence established defendant intended to prevent Lewis from testifying or seeking help from the police about his alleged violent acts. Sergeant McCorkle had conceded defendant did not make any threats to Lewis in the call on February 4, 2018. Counsel argued that while defendant told her not to cooperate, and Lewis responded that she understood, "there's nothing to indicate that at any time [defendant] was intending to prevent her from testifying or from seeking help as to anything in the future."

¶ 25            Upon questioning from the trial court, counsel acknowledged defendant was on probation in September 2018 and was prohibited from having contact with Lewis. Accordingly,

"even just a police report regarding contact could put [defendant] in jeopardy of prison for a probation case that says no contact." Counsel agreed but asserted this did not have "any relevance in whether [defendant] committed a wrongdoing or whether he intended by his acts to prevent [Lewis] from testifying." The following colloquy ensued:

"THE COURT: Okay. So it's the difference between an intent to prevent her from reporting to police, because it would be reporting; I agree there's nothing actually pending at the time.

MS. JAZWIEC: Right.

THE COURT: But a report could result in charges and a petition.

MS. JAZWIEC: Right.

THE COURT: Versus, if you assume for purposes of this motion, just for purposes of this motion that he did do it, then he's just a bad guy who got out of control and killed his girlfriend. Just because that's what he did; not to prevent her from doing anything.

MS. JAZWIEC: Hypothetically. Yes.

THE COURT: Hypothetically. Not the most attractive of arguments, but I get the point. Okay."

¶ 26                                  4. *The Trial Court's Ruling*

¶ 27          On October 5, 2020, the trial court delivered its ruling on the State's amended notice of intent and first motion *in limine*. The court summarized the testimony pertaining to the call defendant placed to Lewis from the jail on February 4, 2018, while he was in custody for aggravated domestic battery against her, telling her to "disappear" and not cooperate. Defendant eventually pled guilty to aggravated domestic battery and was sentenced to probation. The court

concluded the State proved by a preponderance of the evidence that defendant murdered Lewis "at least in part with the intent to prevent her from reporting to the police or to others who would call the police on her behalf." Relying on *People v. Stechly*, 225 Ill. 2d 246 (2007), the court concluded the statements Lewis made to Jefferson and Barkley "would be nontestimonial" and granted the amended motion *in limine*.

¶ 28                                 C. Defendant's Bench Trial

¶ 29            The trial court conducted a bench trial from April 6, 2021, to April 8, 2021.

¶ 30                                 1. *The State's Witnesses*

¶ 31                                 a. Officer Leroy Armendariz

¶ 32            Rockford police officer Leroy Armendariz responded to defendant's apartment at about 8 a.m. on September 11, 2018. Upon arrival, Officer Armendariz observed defendant "smoking a cigarette" and "slowly walking" towards the firefighters assembled outside the building. Officer Armendariz observed a maroon Chevrolet Tahoe parked outside the building. Officer Armendariz asked defendant "what was going on, and he advised that he had just gotten back from Chicago" in the Tahoe. Defendant told Officer Armendariz at least three different times of his return from Chicago; "the first time he said about an hour and then changed it to about 30 or 25 minutes and then said just now." Officer Armendariz felt under the driver's side fender to feel if any heat was emanating from the vehicle since defendant had "just come from Chicago," but did not feel any heat. Defendant then sat in a squad car and spoke with Officer Rose Schiro.

¶ 33                                 b. Officer Rose Schiro

¶ 34            Rockford police officer Rose Schiro responded to defendant's apartment at about 8:02 a.m. on September 11, 2018. Officer Schiro did not enter the apartment but spoke with defendant outside. Defendant "was calm and not saying anything" when Officer Schiro approached

him. Defendant stated he "arrived from Chicago, [and] found his girlfriend inside the apartment breathing but unresponsive." Defendant "said he was there for about a[n] hour." Officer Schiro continued asking defendant what happened, but "his story had changed multiple times." After stating he arrived from Chicago, defendant then said "he came from Aurora." Defendant gave at least three different times for his arrival while speaking with Officer Schiro. First defendant said he arrived an hour ago, then said 25 minutes, and then said he "had just arrived, found [Lewis], and then called us right away."

¶ 35                    c. Detective Michael Battaglia

¶ 36        Rockford police Detective Michael Battaglia responded to defendant's apartment at about 8:19 a.m. on September 11, 2018. Upon arrival, he was informed a warrant was being obtained to search the building. Eventually, Detective Battaglia and other detectives returned and searched defendant's apartment. Detective Battaglia observed "what appeared to have been blood droplets on the floor in that little hallway in front of us." In the bathroom, he observed suspected blood droplets "close to the bathtub" and "on the shower curtain." Suspected blood was observed throughout the bedroom, as well as suspected bloodstains on a blanket and a bedsheet. In the kitchen, he found a suspected blood drop on the middle of the floor and a suspected "blood smear" on the door of the stove. Hair was found on the freezer door and on one of the stove's burner grates and the temperature knob. In the southwest bedroom, he found "a red-handled hammer on a nightstand that appeared to have a hair on it." Detective Battaglia also found two suspected bloodstains on the floor, a small piece of glass on the floor, and suspected blood on the end of an air mattress.

¶ 37                    d. Sergeant Kevin Gulley

¶ 38        Rockford police Sergeant Kevin Gulley reported to defendant's apartment at about

3 p.m. on September 11, 2018. Sergeant Gulley discovered Lewis's body inside bearing "multiple bruises and contusions." Some of the bruising was "consistent with *** narrow whip marks."

¶ 39                                    e. Sergeant Sarantopoulos

¶ 40          Sergeant Sarantopoulos testified about the conversation he had with Lewis on January 30, 2018, concerning two incidents of domestic violence with defendant earlier that month. On January 21, 2018, defendant woke up from a nap and "hit [Lewis] in the head with a two-by-four twice," cutting the top of her head. Lewis only wanted to get away from defendant and did not want him arrested. On January 24, 2018, defendant picked Lewis up from his sister's home. Defendant was "being nice to [Lewis]; so she left with him." However, as soon as Lewis got in the back seat of the SUV, defendant started to beat her with a stick, which was two or two and one-half feet in length, until it broke. Sergeant Sarantopoulos observed "a fairly dark bruise on [Lewis's] upper [right] arm," and Lewis stated she had bruises on her back that were covered by her clothing. The injuries were photographed but Lewis did not want to provide a written statement.

¶ 41                                    f. Officer Grana

¶ 42          Officer Grana testified about a conversation he had with Lewis on February 2, 2018, at SwedishAmerican Hospital in Rockford, regarding a domestic violence incident defendant committed the previous day. Officer Grana observed "bruising and red marks around [Lewis's] left eye and her left eye was swelled shut," as well as "scratch marks, red marks, and bruises on [her] neck." Lewis gave a written statement to Officer Grana, explaining how she suffered these injuries. (Over objection, the trial court allowed Lewis's statement, pursuant to the doctrine of forfeiture by wrongdoing, as it was included in the State's amended notice of intent.) In sum, Lewis stated she was sitting in her living room when defendant approached her, grabbed her hair with

both hands, pulled her to the floor from the couch, put his right knee on her right shoulder, and began choking her with both hands. Defendant let go of Lewis and dragged her by her hair into another room, where he again began to choke her and rendered her unable to breathe. Lewis escaped to the kitchen, but defendant attempted to push her face onto the stove while the burners were lit. Lewis wanted to pursue criminal charges for this incident.

¶ 43                                                    g. Nurse Wendy Sennett

¶ 44         Nurse Wendy Sennett worked at SwedishAmerican Hospital on August 23, 2018, treating Lewis on the medical-surgical floor. She observed bruising over "multiple areas over [Lewis's] body and torso." While outside Lewis's room, Nurse Sennett heard her say, on the phone, "He had beat the s*** out of me." When Nurse Sennett walked back in, Lewis would not discuss it with her, saying only she was injured by being "jumped by some females."

¶ 45                                                    h. Dr. Yousuf Baig

¶ 46         Dr. Yousuf Baig, a physician at SwedishAmerican Hospital, treated Lewis on August 23, 2018, and August 24, 2018. During his physical examination of Lewis, Dr. Baig observed various injuries, including "bruising on her torso, her chest, her arms, [and her] legs." Dr. Baig testified Lewis must have sustained injuries to "at least 25 percent of the area" if the injuries were sufficiently "significant to document *** in the chart." Lewis reported having been "jumped after a party." Lewis left the hospital the following day against medical advice.

¶ 47                                                    i. Clayton Oakes

¶ 48         Clayton Oakes knew Lewis since 1999 and had two children with her. Lewis lived with defendant most of the time in 2018. Oakes testified regarding how Lewis described her relationship with defendant:

"Closer to the time of her passing, *** she explained that the relationship was definitely rough. She told me that certain people she couldn't talk to. She definitely had to be careful who she dealt with or who she talked to. She mentioned to me that she was scared. I mean, at first, the relationship between them was—I guess it was—it wasn't as bad as towards the end, I mean, but she got kind of scared towards the end. I'm looking at maybe even July, August, around when it got around that time, *** she mentioned a lot about the relationship not being good."

Clayton testified to seeing "bruising around [Lewis's] eye, on the facial area where she probably put makeup on to try to cover it up, of course, not too much of anything on her body because she was covered up." Lewis "seemed like she was always covered up, extra excessive clothing."

¶ 49                          j. Shreen Jefferson

¶ 50        Shreen Jefferson had known Lewis since 2010 and testified about her interaction with her on August 26, 2018. Lewis sent a text message to Jefferson asking to come over to her house because "she said she needed some help because *** her boyfriend had beat her the day before with a two-by-four." After Lewis arrived, she took off her sweater, revealing "blue-and-black, big, huge bruises" on her arms and legs. It also appeared Lewis's thumb was broken. Jefferson recommended Lewis get medical attention, but she "was scared to go." Lewis did not say why. Jefferson told Lewis not to go back to the person who battered her, who Lewis identified as "Duke," "because all it was going to do is get worse." Lewis told Jefferson this person was sending her threatening text messages while she was at the house. Lewis left the next day and several days later contacted Jefferson through Facebook Messenger, asking, "Can you help me, please?" Jefferson did not remember if she responded.

¶ 51                                    k. Yolanda Barkley

¶ 52           Yolanda Barkley testified she received a text message from Lewis shortly before 1 a.m. on September 9, 2018. Lewis wrote "that she was running away from an abusive situation and she needed a place to go for the night." Lewis arrived with a "big suitcase" and stayed for a "couple days." Barkley saw bruises on Lewis's body, which she said were inflicted during an incident "the night before." Barkley observed "a lot of [Lewis's] hair being pulled out from the scalp and she had very big black marks all over her legs." One night, Lewis "had a visitor" at Barkley's home, who Lewis referred to as "Duke." (Barkley identified "Duke" in court as defendant.) Lewis told Barkley she was "very afraid of him."

¶ 53                                    l. Kisiah Yttrie

¶ 54           Kisiah Yttrie lived in the apartment below defendant with her boyfriend and two children. After defendant and Lewis moved into the apartment above Yttrie around September 1, 2018, Yttrie would hear "a lot of arguing" upstairs "almost every night." Yttrie testified she returned home from work on September 10, 2018, at about 11:30 p.m. Yttrie heard arguing upstairs while she was making dinner. Defendant and Lewis continued arguing, "yelling at each other," until about 2 a.m. At approximately 4:30 a.m., Yttrie was woken up by "a lot of loud noises, like stuff was being thrown around" upstairs. Yttrie fell asleep again at about 5 a.m. and was awakened by police activity around 8 a.m.

¶ 55                                    m. Dr. Mark Peters

¶ 56           Dr. Mark Peters is a forensic pathologist who conducted Lewis's autopsy on September 12, 2018. Dr. Peters determined the cause of Lewis's death as "soft tissue hemorrhage caused by multiple blunt trauma resulting from a beating." The extent of the bruising to Lewis's soft tissue was such that she "had almost no blood left in her heart or her blood vessels." All of

Lewis's organs were "very pale" due to the "extensive soft tissue hemorrhage from all these contusions and injuries that we saw that caused critical blood loss to her cardiovascular system." These injuries could not be caused by "falling and hitting one's head against the wall" or "falling into a stove burner." Dr. Peters did not create a "body diagram" in the process of conducting Lewis's autopsy, as "the injuries were too numerous and too complex to fit on a body diagram." Dr. Peters attempted to count the number of "discrete impact sites" on Lewis's body, but he "stopped at about a hundred."

¶ 57                    2. *Defendant's Motion for Directed Verdict*

¶ 58        At the close of the State's case, defendant filed a motion for a directed verdict which was denied. Defendant was admonished of his right to testify, he declined to do so, and he presented no additional evidence.

¶ 59                    3. *The Trial Court's Verdict and Sentence*

¶ 60        On April 12, 2021, the trial court found defendant guilty of counts I and VII of the bill of indictment. The court found defendant not guilty of count IV, which alleged defendant committed the offense of first degree murder in that he struck Lewis multiple times, knowing such acts would cause her death and thereby causing her death. The court explained, "I don't know that you knew you were causing her death, but I believe that you were intending great bodily harm to her on that day and on many previous days. It got away from you this time, and it resulted in her death."

¶ 61        Defendant filed a "Motion for Judgment Notwithstanding the Guilty Finding or, Alternatively, for a New Trial" on May 11, 2021, and a supplemental motion on February 17, 2023. The trial court denied these motions on October 20, 2023. On December 13, 2023, the court sentenced defendant to 55 years' imprisonment.

¶ 62        This appeal followed.

¶ 63                            II. ANALYSIS

¶ 64                        A. The Arguments on Appeal

¶ 65                        1. *Defendant's Arguments*

¶ 66        On appeal, defendant argues Lewis's statements to Detective Sarantopoulos and Officer Grana constitute testimonial hearsay which, due to the inability of defendant to confront and cross-examine her and due to the inapplicability of the doctrine of forfeiture by wrongdoing, was inadmissible under the confrontation clause of the sixth amendment to the United States Constitution (U.S. Const., amend. VI). Defendant contends these statements were inadmissible in that the State did not prove he murdered Lewis with the intent of preventing her from testifying at an upcoming or pending proceeding. The doctrine of forfeiture by wrongdoing would only allow the admission of such statements where the defendant murdered the victim to prevent her testimony, not her ability to report her abuse to police before any prosecution had been initiated. But even if this doctrine did apply to allow such statements when the defendant merely intended to prevent the victim from reporting to police, the State did not prove such intent here, as its evidence as to this was only "thin and limited." The admission of both the statements to law enforcement personnel *and* the statements to Jefferson and Barkley violated the Illinois rule against hearsay, given the inapplicability of the doctrine of forfeiture by wrongdoing in that context, too.

¶ 67                        2. *The State's Arguments*

¶ 68        In response, the State argues, "it established by a preponderance of the evidence the elements of the forfeiture by wrongdoing doctrine." The State also asserts that, pursuant to pertinent caselaw, the occurrence of an ongoing proceeding, while *relevant* to establish a defendant's intent to prevent the victim from testifying (or reporting her abuse to police), is not

*necessary* for this purpose. In any case:

> "The evidence was clear that defendant had previously beaten Ms. Lewis with the intent to control her; that he had been incarcerated for this conduct in the recent past; that he was concerned Lewis would report his abuse to the police or others; and [he] had while previously incarcerated acted to dissuade her from testifying or cooperating with authorities."

Furthermore, the hearsay statements Lewis made to Jefferson and Barkley are "nontestimonial" and, therefore, do not implicate the confrontation clause. Nevertheless, the State established their admissibility pursuant to the forfeiture by wrongdoing doctrine as an independent principle of Illinois evidentiary law.

¶ 69          B. The Confrontation Clause and the Rule Against Hearsay

¶ 70          As will be discussed below, the doctrine of forfeiture by wrongdoing, pursuant to which the trial court permitted testimony as to all these statements, is an exception to both the confrontation clause and the rule against hearsay established in Illinois evidentiary law. The propriety of its application by the trial court is the core issue presented in this appeal.

¶ 71          1. *Pertinent Principles of the Confrontation Clause*

¶ 72          The United States Supreme Court has issued a series of decisions setting forth the parameters of what constitutes "testimonial hearsay," such that a defendant would be entitled under the confrontation clause to confront and cross-examine the declarant of those statements at trial. Importantly, these decisions address the concept of "testimonial hearsay" in the context of communications with law enforcement personnel and where the prosecution seeks to admit the statements of an unavailable declarant pursuant to the doctrine of forfeiture by wrongdoing.

¶ 73                                    a. *Crawford v. Washington*

¶ 74          In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), the United States Supreme

Court observed that the confrontation clause "reflects an especially acute concern with a specific

type of out-of-court statement." Importantly, "even if the Sixth Amendment is not solely concerned

with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers

fall squarely within that class." *Id.* at 53. The Court noted, "the rule of forfeiture by wrongdoing

(which we accept) extinguishes confrontation claims on essentially equitable grounds." *Id.* at 62.

The Court held:

> "Where testimonial evidence is at issue *** the Sixth Amendment demands
>
> what the common law required: unavailability and a prior opportunity for
>
> cross-examination. We leave for another day any effort to spell out a
>
> comprehensive definition of 'testimonial.' Whatever else the term covers,
>
> it applies at a minimum to prior testimony at a preliminary hearing, before
>
> a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

¶ 75                                    b. *Davis v. Washington*

¶ 76          In *Davis v. Washington*, 547 U.S. 813, 821 (2006), the United States Supreme Court

noted its earlier decision in *Crawford* dealt with the concept of "testimonial statements," as only

they "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause."

Regarding their delivery to law enforcement personnel, the Court articulated working definitions

of testimonial and nontestimonial hearsay statements:

> "Statements are nontestimonial when made in the course of police
>
> interrogation under circumstances objectively indicating that the primary
>
> purpose of the interrogation is to enable police assistance to meet an

ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

¶ 77                                    c. *Giles v. California*

¶ 78          In a murder case, the prosecution wanted to introduce statements the victim gave to police regarding a prior domestic violence incident perpetrated by the defendant. *Giles v. California*, 554 U.S. 353, 356-57 (2008). The trial court admitted the statements over defendant's counsel's objection. *Id.* at 357. The defendant was found guilty of first degree murder. *Id.* Both the California Court of Appeal and California Supreme Court affirmed, concluding the admission of the statements did not violate the confrontation clause "because *Crawford* recognized a doctrine of forfeiture by wrongdoing," pursuant to which the defendant forfeited his right to confront and cross-examine the victim (declarant), having "committed the murder for which he was on trial, and because his intentional criminal act made [the victim] unavailable to testify." *Id.*

¶ 79          The main issue before the United States Supreme Court was whether the doctrine of forfeiture by wrongdoing, as construed by the California appellate courts, was "a founding-era exception to the confrontation right." *Id.* at 358. The Court observed that "[t]he terms used to define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying." (Emphasis in original.) *Id.* at 359. The Court reversed the judgment of the California Supreme Court. *Id.* at 377. The Court concluded "[t]he state courts *** did not consider the intent of the defendant because they found that irrelevant to application of the forfeiture doctrine" and "[t]his view of the law was error." *Id.* In so concluding, however, the Court made the following statement regarding the unique nature of

crimes of domestic violence for demonstrating a defendant's intent to murder the victim (declarant) specifically to prevent her from communicating with police or testifying at trial about her abuse:

> "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. *Earlier abuse*, or threats of abuse, *intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry*, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (Emphases added.) *Id.*

¶ 80          2. *Lewis's Statements to Police Constituted Testimonial Hearsay*

¶ 81          A defendant's claim that his right to confront and cross-examine his accuser was violated is a question of law reviewed *de novo. People v. Leach*, 2012 IL 111534, ¶ 64. In assessing whether the trial court violated the confrontation clause by admitting Lewis's statements to Detective Sarantopoulos and Officer Grana regarding prior incidents of domestic violence defendant committed, we must first consider whether the statements at issue constitute "testimonial hearsay" and, therefore, implicate the confrontation clause at all. As the supreme court stated in *Stechly*, "the threshold question in confrontation clause analysis is, Are the statements at issue 'testimonial'? If not, the confrontation clause places no restriction on their introduction (although they are still subject to 'traditional limitations upon hearsay evidence' [citation]." *Stechly*, 225 Ill.

2d at 279. Whether a statement is testimonial likewise is a question of law reviewed *de novo*. *People v. Sutton*, 233 Ill. 2d 89, 112 (2009).

¶ 82 In *Crawford*, the Court noted "[s]tatements taken by police officers in the course of interrogations are *** testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52. But in *Davis*, the Court clarified such statements are only deemed testimonial if "the circumstances objectively indicate that there is no *** ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. Detective Sarantopoulos testified, both at the hearing on the State's motion *in limine* and at trial, about speaking with Lewis, on January 30, 2018, about two incidents of domestic violence perpetrated by defendant several days earlier. Officer Grana testified at trial about speaking with Lewis, on February 2, 2018, about an incident of domestic violence perpetrated by defendant the day before. Lewis, in the hospital during her conversation with Officer Grana due to the injuries defendant inflicted upon her the previous day, provided a written statement in which she described the incident and insisted upon pursuing criminal charges. Accordingly, it is clear Lewis did not speak with Detective Sarantopoulos and Officer Grana in the context of "enabl[ing] police assistance to meet an ongoing emergency" such as would render her statements "nontestimonial." *Id.* Rather, the circumstances of their conversations with Lewis "objectively indicate[d] that there [was] no such ongoing emergency" and the "primary purpose" of their interactions with her was to "establish or prove past events potentially relevant to later criminal prosecution." *Id.* Thus, Lewis's statements to both Detective Sarantopoulos and Officer Grana constituted testimonial hearsay.

¶ 83          3. *Lewis's Statements to Jefferson and Barkley*

*Constituted Nontestimonial Hearsay*

¶ 84          In granting the State's amended motion *in limine*, the trial court, relying on *Stechly*, 225 Ill. 2d 246, concluded the statements Lewis made to Jefferson and Barkley "would be nontestimonial." Before this court, defendant implicitly agrees with this determination in proposing "Illinois evidentiary law," and not the confrontation clause, as the basis for the inadmissibility of these statements. There is no dispute by either defendant or the State that Lewis's statements to Jefferson and Barkley constituted nontestimonial hearsay, which, while not subject to the restrictions of the confrontation clause, are still subject to the restrictions of the hearsay rule. See *Stechly*, 225 Ill. 2d at 279.

¶ 85          4. *The Trial Court Did Not Err in Admitting Statements to Police*

*Pursuant to the Doctrine of Forfeiture by Wrongdoing*

¶ 86          a. The Doctrine of Forfeiture by Wrongdoing

¶ 87          Our supreme court has recognized the doctrine of forfeiture by wrongdoing "serves both as an exception to the hearsay rule and to the confrontation clause of the sixth amendment." *People v. Chatman*, 2024 IL 129133, ¶ 32. This doctrine is codified in Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011). *Chatman*, 2024 IL 129133, ¶ 32. Pursuant to Rule 804(b)(5), "[a] statement offered against a party that has engaged *** in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the rule against hearsay. Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). To satisfy this exception, the State has the burden of proving by a preponderance of the evidence the defendant engaged in wrongdoing that was intended to, and did, result in the unavailability of the declarant. *Chatman*, 2024 IL 129133, ¶ 34. The propriety of a trial court's application of the doctrine of forfeiture by wrongdoing is reviewed

under the manifest weight of the evidence standard. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 88    The supreme court's decision in *People v. Peterson*, 2017 IL 120331, is particularly instructive for this inquiry. Defendant asserts the supreme court did not address the doctrine of forfeiture by wrongdoing "in a constitutional context but only as a matter of Illinois evidentiary law," and, consequently, this court should only "consult *Crawford* and *Giles* for the constitutional answer." Defendant contends the doctrine of forfeiture by wrongdoing would be construed as only applying to instances where a defendant procures the declarant's unavailability to prevent her testimony at a pending trial and *not* where the defendant does this to prevent the declarant from reporting her abuse to the police. The State disagrees, asserting that, in *Peterson*, the supreme court "specifically states the forfeiture by wrongdoing doctrine *** applies also to extinguish confrontation clause claims" and, therefore, "defendant's argument that constitutional issues remain unaddressed is without merit." The State further contends that, pursuant to *Giles*, the forfeiture doctrine can apply where a defendant procures the declarant's unavailability to prevent her from reporting her abuse to the police.

¶ 89    We agree with the State's position as to the import of *Peterson*. Footnote four of *Peterson* states the defendant "concede[d]" the forfeiture by wrongdoing doctrine stands as an exception to the hearsay rule *and* extinguishes confrontation clause claims. *Id.* ¶ 51 n.4. Additionally, the *Peterson* court extensively addressed *Giles*, which was a decision on the forfeiture by wrongdoing doctrine as an exception to the confrontation clause. Thus, *Peterson* does address the constitutional dimensions of this doctrine and not merely those of the rule against

hearsay. Substantively, *Peterson* acknowledges what *Giles* "expressly contemplated"—namely, "that the forfeiture doctrine could apply not only where the defendant's efforts were designed to prevent testimony at trial but also where the defendant's efforts were designed to prevent testimony to police, *i.e.*, reporting criminal conduct." *Id.* ¶ 54. The *Peterson* court explained:

"When we codified the common-law doctrine of forfeiture by wrongdoing in Illinois Rule of Evidence 804(b)(5), we did not condition the doctrine's application on the existence of a pending legal proceeding. \*\*\*

Were we to hold otherwise, the equitable underpinnings of the forfeiture by wrongdoing doctrine would be undermined, and the doctrine's very purpose—to prevent a defendant from thwarting the judicial process by taking advantage of his own wrongdoing [citations]—would be defeated. Equity demands that a defendant who silences a witness, or a potential witness, through threats, physical violence, murder, or other wrongdoing should not be permitted to benefit from such conduct based solely on the fact that legal proceedings were not pending at the time of his wrongdoing."

*Id.* ¶¶ 56-57.

Thus, pursuant to *Peterson* and *Giles* itself, the doctrine of forfeiture by wrongdoing can apply to instances where a defendant procures the unavailability of a declarant for the purpose of preventing her from reporting to the police and not just from testifying at a pending trial.

¶ 90           b. The Admission of Lewis's Statements Pursuant to the

Doctrine of Forfeiture by Wrongdoing

Was Not Against the Manifest Weight of the Evidence

¶ 91        As explained above, the trial court admitted Lewis's statements to Detective Sarantopoulos, Officer Grana, Jefferson, and Barkley, pursuant to the doctrine of forfeiture by wrongdoing. After stating it relied in part on *Giles*, the court concluded the State proved by a preponderance of the evidence defendant murdered Lewis "at least in part with the intent to prevent her from reporting to the police or to others who would call the police on her behalf." This court concludes the trial court's determination was not against the manifest weight of the evidence. The court noted that, due to defendant being on probation after pleading guilty to aggravated domestic battery (against Lewis), "the mere fact of contact, let alone further acts of abuse, could have resulted in *** defendant going back to jail and/or prison." Detective Sarantopoulos testified about learning from Lewis on January 30, 2018, that defendant beat her twice within the preceding nine days, first by striking her in the head with a two-by-four and then beating her with a large stick until it broke. During his conversation with Lewis, Detective Sarantopoulos observed numerous injuries to her body, resulting from these incidents. Officer Grana testified about learning from Lewis on February 2, 2018, that defendant, the day before, approached her while she was sitting on the couch, grabbed her by the hair with both hands, pulled her to the ground, put his right knee on her right shoulder, began choking her with both hands until she could not breathe, dragged her by her hair into another room, and choked her again. Thereafter, defendant attempted to push Lewis's face onto the stove while the burners were lit. Jefferson testified about Lewis contacting her in late August 2018, requesting shelter due to defendant beating her with a two-by-four the day before and defendant arriving with "big, huge bruises" on her arms and legs and possibly a broken thumb. Barkley testified about Lewis contacting her in September 2018 (only two days before Lewis's murder) asking for shelter while she "was running away from an abusive situation." When

Lewis arrived at Barkley's home, she had bruises, which she explained defendant, who she was "very afraid of," had inflicted the night before. In addition, "a lot" of her hair had been pulled out.

¶ 92    This pattern of extreme violence by defendant against Lewis, preceding and culminating in her murder, was more than sufficient for the trial court to infer he murdered her with the intent to prevent her from either testifying or reporting her abuse to police. It demonstrates defendant's extensive history of harming Lewis, undeniably with the intent to control her, isolate her, and put her in grave fear of continuing or even escalating abuse should she act for her own safety by reporting it to the police. Indeed, the February 1, 2018, incident about which Lewis spoke with Officer Grana was the one for which defendant was incarcerated and about which he told Lewis during a call from the jail to "disappear" and not "cooperate." We conclude the trial court's finding of the necessary factual predicate for the application of the forfeiture by wrongdoing doctrine was not against the manifest weight of the evidence, as the opposite conclusion is not clearly evident nor is the one reached unreasonable, arbitrary, or not based on the evidence presented. See *Best*, 223 Ill. 2d at 350; *Peterson*, 2017 IL 120331, ¶ 39.

¶ 93    As a final observation, we disagree with defendant's contention that the trial court believed he was " 'just a bad guy who got out of control and killed his girlfriend' " and " 'not to prevent her from doing anything' " such that the State did not prove his intent to murder Lewis for the purpose of preventing her testimony (or reporting to police). Defendant goes so far as to say this is the view "the judge stated." We disagree. It is clear the trial court was posing a hypothetical to defendant's counsel to determine the parameters of the forfeiture by wrongdoing doctrine. The court was clarifying the distinction between a defendant committing a murder for the purpose of preventing a declarant from reporting to the police and committing an impulsive act of murder with no such purpose contemplated. Counsel agreed with this distinction for purposes of the

- 25 -

applicability of the forfeiture by wrongdoing doctrine. Hence, we reject defendant's attempt to attribute more to the court's comment than what it denotes when it is viewed in its proper context.

¶ 94                    5. *Defendant's Cumulative Error Argument*

¶ 95          Defendant argues the trial court's admissions of these statements constitute cumulative errors of constitutional magnitude, which were "not harmless beyond a reasonable doubt," requiring reversal and remand for a new trial. This court has concluded the trial court did not err at all. Thus, there can be no cumulative error. See *People v. Watts*, 2022 IL App (4th) 210590, ¶ 85.

¶ 96                         III. CONCLUSION

¶ 97          For the reasons stated, we affirm the trial court's judgment.

¶ 98          Affirmed.

*People v. Thomas*, 2025 IL App (4th) 231504

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 18-CF-2508; the Hon. Debra D. Schafer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Levin and Daniel E. Radakovich, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |