2025 IL App (2d) 240485-U
No. 2-24-0485
Order filed August 12, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-CF-1067 |
| | ) | |
| PRINCE CUNNINGHAM, | ) | Honorable |
| | ) | Julia A. Yetter, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the State moved under the forfeiture-by-wrongdoing doctrine to admit the murder victim's statements before her disappearance, the trial court erred in finding that, although defendant caused the victim's unavailability as a witness by murdering her, he was not motivated, even in part, to prevent the victim from reinitiating a child support action she had previously brought against defendant and dismissed. The State's circumstantial evidence was sufficient to establish that, whatever else may have motivated defendant, he intended to forestall the child support case.

¶ 2    Defendant, Prince Cunningham, was charged with two counts of first degree murder for causing the death of Tyesha Bell (720 ILCS 5/9-1(a)(1), (2) (West 2002)). The State filed a motion *in limine* seeking to admit, through the doctrine of forfeiture by wrongdoing, statements made by

the victim. Following two days of testimony, the trial court denied the motion, finding that, although the State proved by a preponderance of the evidence that defendant killed Bell, it failed to prove that the murder was intended, at least in part, to prevent Bell's testimony in a future child support case. The State appeals. We find that the trial court's denial of the motion was against the manifest weight of the evidence because the opposite conclusion is clear from the record. Accordingly, we reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4    Bell was last seen alive on the night of May 8-9, 2003. Her mother, Lorna Smith, reported her missing on May 10, 2003. Smith told police that Bell had been in a relationship with defendant and that he was the father of Bell's young daughter, T.B. Shortly thereafter, police interviewed defendant regarding his relationship with Bell. In that interview, defendant denied having a sexual or romantic relationship with Bell and denied that he was the father of Bell's daughter. Bell's remains were discovered on December 21, 2020. Once the cause of death was determined to be a gunshot wound to the back of Bell's head, the missing person case became a murder case. The Aurora Police Department further investigated the case for another year and a half. On June 14, 2022, defendant was arrested and charged with two counts of first degree murder.

¶ 5    On March 4, 2024, the State filed a motion *in limine* seeking to admit, pursuant to the doctrine of forfeiture by wrongdoing, statements made by Bell. The motion detailed the statements the State sought to admit. The State argued that defendant murdered Bell "to prevent her from testifying or restarting the [c]hild [s]upport [e]nforcement case" she had previously brought against defendant but later dismissed.

¶ 6    On May 2 and 3, 2024, the trial court held an evidentiary hearing on the State's motion. The statements the State sought to admit were testified to by police officers, relying in part on police reports.

¶ 7    At that hearing, Jeff Koenings, an Aurora police detective, testified that the Aurora police began an investigation following Smith's May 10, 2003, report that Bell was missing and had not been seen since the evening of May 8-9, 2003. When Bell disappeared, she was 22 years old and T.B. was just under two years old. Koenings became aware of Bell's disappearance in 2003, though he was in a different departmental unit at that time and not yet a detective. In 2003, the lead investigator in the case was Jim Coursey. After Coursey retired around 2006, Koenings became the lead investigator. Koenings confirmed that his knowledge of the first few years of the investigation was based on reading the case file, examining the evidence, and speaking with Coursey. Koenings testified to the reports of other police detectives, over defense counsel's standing objection to triple hearsay statements. In what follows, we detail the various reports Koenings described in his testimony.

¶ 8    A report by Detective Patricia Gonzalez reflected that Smith suspected defendant of having something to do with Bell's disappearance. Smith's suspicion was based on phone records she obtained showing that defendant was the last person Bell spoke to. Gonzalez's report also showed that she interviewed defendant on May 12, 2003. Gonzalez reported that she asked defendant if he knew Bell. He said he did because he was a second-shift manager at Eby-Brown and Bell used to work there. Gonzalez asked defendant if he knew any of Bell's friends, and defendant said no. Koenings then read verbatim from Gonzalez's report:

   "I asked [defendant] when the last time he spoke with [Bell] [*sic*] and he stated approximately [two] months ago. [Defendant] stated that he's married. [Defendant]

advised that MP, which is missing person, claims that he is her baby's fathers [*sic*], however he denies this.

[Defendant] advised they were garnishing his wages for child support, but he told them she, the missing person, that she would have to have it stopped because he was going to get a lawyer and sue her and she did.

She asked him now—according to the report, she asked him if he ever had a sexual relationship with her and he denied that. She asked if he is the father of her child and he denied that."

Defendant believed that Bell claimed her daughter was his child because "he has a good job and he makes good money" and she was "trying to get some money from him." Defendant agreed that the situation with Bell was creating "marital problems" for himself. Gonzalez also documented that, at some point, Bell had been arrested for criminal trespass because she came to defendant's house and refused to leave.

¶ 9    Coursey interviewed Bell's friend Tiffany James on May 12, 2003. In the interview, James explained that she and Bell were out shopping with a group on the evening of May 8, 2003, the last day Bell was seen. James stated that Bell argued over the phone with defendant while the group was shopping. According to James, defendant was Bell's boyfriend and the father of her daughter. James learned from Bell that defendant was supposed to stop by later that night to deliver $12,000 to Bell so that she could buy a new car. James dropped Bell off at home around midnight on May 8. James planned to pick Bell up the next day to take her to court. James also said that she and Bell were good friends and talked every day. However, James reported that, after she dropped Bell off on May 8, she never heard from Bell again.

¶ 10    Coursey interviewed Bell's friend Cloris Williams on May 13, 2003. Williams had joined Bell and James on the shopping trip on May 8, 2003. Bell told Williams that defendant was supposed to stop by after work to drop off money for a car. During the shopping trip, Bell left defendant a voicemail message. Williams spoke with Bell "later in the night," after Bell returned home from the shopping trip. According to the report, "they kind of recapped what had happened, what they did." Williams said that, after the phone call, she never heard from Bell again, which was unusual because they were in the habit of speaking three or four times a day.

¶ 11    Coursey interviewed defendant on May 13, 2003. The interview was conducted at Eby-Brown in Montgomery, defendant's place of employment. Defendant denied that he had spoken with Bell recently. He stated that he had received a voicemail from Bell on May 8, 2003, between 6 p.m. and 7 p.m. Defendant had deleted the voicemail, but he recalled that Bell had asked him in the voicemail to call her back. He did not do so. Defendant said he had spoken to Bell two weeks earlier; according to defendant, she was trying to get her job back at Eby-Brown and he referred her to the personnel department. Defendant "denied having any type of a physical or sexual or dating relationship" with Bell. Coursey told defendant that Bell's friends and family said that he and Bell had been in a romantic relationship and shared a child. Defendant continued to deny any relationship with Bell. He also denied being involved with Bell's disappearance or knowing where she was. Defendant later suggested that Bell "left on her own because of a court date that she had that Friday." Gonzalez confirmed that Bell had a court date in Will County on Friday, May 9, 2003, at 9 a.m. for three traffic tickets, but Bell never appeared. When Coursey expressed disbelief that Bell would leave town over three traffic tickets, defendant claimed that Bell was having problems with people in her neighborhood.

¶ 12 Coursey interviewed Bell's sister, Latasha Bell, on May 13, 2003. At the time of the disappearance, the two sisters lived together in an apartment in Aurora. Latasha said that Bell had had a relationship with defendant and that she had seen him at their apartment. Latasha gave Coursey a photo album. Koenings placed the album into police evidence. Koenings identified defendant in several of the photographs in the album. He also stated that the album contained a handwritten notation that read "I *** heart Prince." According to Latasha, the handwriting was Bell's. Koenings described another photo as showing Bell and defendant "with their faces together." Latasha also identified the individuals as Bell and defendant. Near the photo were handwritten notations that read "Mr. & Mrs. Prince Cunningham" and "Tyesha 'n' Prince." Latasha identified the handwriting as Bell's. The trial court then admitted the photographs into evidence.

¶ 13 Coursey reported that Latasha said she knew that defendant and Bell were in a relationship because he would come by their apartment when he was done working. Latasha would see the two of them together. Latasha said that defendant stopped coming into their apartment about a month before Bell disappeared. When Coursey asked Latasha whether she had ever seen defendant give money to Bell, she stated that, after Bell was released from the Kane County jail in February 2003, defendant came over to drop off money for Bell. Bell was not at home, so Latasha received the $400 defendant intended for Bell. Latasha also stated that Bell told her she had received money from defendant on other occasions.

¶ 14 The State asked Koenings, "Now, prior to the disappearance happening, did [Bell] tell [Latasha] that she felt she might be pregnant as she was late on her period?" Koenings responded, "She did say that." According to Koenings, Coursey's report went on to detail Latasha's account of the night of May 8, 2003, into the early morning of May 9. At some point after Bell returned

from her shopping trip, she came into Latasha's bedroom to ask where T.B. was. Latasha told her that T.B. was staying with their cousin (later identified as Tamika Bell) for the night. Bell returned to her own bedroom, and Latasha could hear her talking on the phone. Latasha turned up her TV to drown out the sound and went to sleep. Latasha did not know who Bell was talking to. Latasha knew from Bell that she expected defendant to come over after his shift ended to drop off money. Latasha also said that defendant had mentioned buying Bell a new car or truck since hers had been repossessed. On the morning of May 9, Latasha awoke to find Bell was gone. She found a candle still burning in Bell's bedroom, and the bedroom lights were on with the door open. Latasha said that Bell never would have left a candle burning all night. Latasha did not know when Bell left the apartment. Latasha never heard from Bell again.

¶ 15    Detective Guillermo Trujillo interviewed members of the child support enforcement division on May 14, 2003. Because defendant had mentioned taking a paternity test, Trujillo contacted Kim Meeks to check the results of that test. Meeks confirmed that a paternity test had been done on December 11, 2001, with DNA collected from Bell, defendant, and T.B. About four weeks later, the test results came in, confirming that defendant was T.B.'s father. Afterward, defendant's wages were garnished to provide child support to Bell. According to Meeks, Bell asked for the case to be closed in November 2002. Her request was granted, and the garnishment of defendant's wages ended less than a year after it began.

¶ 16    Trujillo also interviewed Bell's landlord, Tom Carter, on May 14, 2003. Carter confirmed that Latasha lived with Bell in the Aurora apartment. Carter said that Bell paid the rent for the apartment and that she paid "in cash in 20s and 50s."

¶ 17    Coursey interviewed Korey Patrick on May 14, 2003. Patrick said that he and Bell were not dating but had dated in the past. Phone records showed that Patrick and Bell had spoken by

phone several times on the night of May 8-9, 2003. Patrick said that Bell had spoken to him about the two of them getting back together, but he told her it was not a good idea, and she seemed to accept that. Bell told Patrick that defendant was going to buy her a new car and that they were going to get the car "on Friday." Patrick said he never heard from Bell again after their phone calls that night.

¶ 18 Detective Fedorski (first name not given) interviewed Rick Thorgesen on May 15, 2003. Thorgesen was vice president of human resources for Eby-Brown. He confirmed that defendant had had his wages garnished for child support and that the garnishment was canceled shortly after it began.

¶ 19 Fedorski interviewed Rodney Capanash on May 15, 2003. Capanash was the human resources manager for Eby-Brown. He confirmed that defendant worked there during the afternoon shift, which ran from 2:30 p.m. to 11 p.m. Defendant worked Sunday through Thursday each week, typically starting around 1:30 p.m. and leaving a little after midnight.

¶ 20 Coursey interviewed Louise Bell on May 20, 2003. Louise was Bell's aunt and Tamika's mother. Louise stated that Bell's daughter had spent the night of May 8-9, 2003, at Louise's home. Bell called Louise's home twice on the evening of May 8. Phone records showed that the calls were placed at 7:33 p.m. and 9:44 p.m. During one of those calls, Bell was told she should wait until the next day to get her daughter since it was raining and the child was asleep. Bell never came to get her daughter on May 9.

¶ 21 Coursey interviewed Venus Jackson on June 7, 2003. Jackson was a friend of Bell's. Bell told Jackson that defendant was paying her rent and had paid for her car. Based on his investigation, Coursey believed her car to be a black 1995 Dodge Intrepid, which had been repossessed shortly before Bell's disappearance. Bell also told Jackson that defendant was going

to get a divorce and that she and her daughter were going to get an apartment with defendant. According to Jackson, Bell kept asking to see that apartment, but defendant kept making excuses. Jackson also stated that defendant would come to Bell's apartment after he was done working, around 1:30 or 2 a.m., and that they usually just stayed in the apartment. Jackson said she was not aware of Bell having any "problems" with anyone other than defendant and his wife.

¶ 22    Detective Byrd (first name not given) interviewed Capanash on June 12, 2003. Capanash told Byrd that defendant only took one sick day in 2003: May 11, one day after Bell was reported missing.

¶ 23    Coursey interviewed Patrick again on June 30, 2003. Patrick related that defendant paid Bell's rent. On one occasion, he was at Bell's apartment when Bell went downstairs to meet defendant to get money from him. Bell came back with cash, which Patrick later used to pay her rent. According to Patrick, when he talked to Bell over the phone on the night of May 8-9, 2003, she told him that defendant was going to buy her a car. Patrick was unclear on whether defendant was going to give Bell $12,000 to buy a car or take her car shopping for up to $12,000.

¶ 24    On August 11, 2003, Coursey interviewed Earl Hughes, who was a manager for a car dealership called Auto Connections. Coursey's report contained a handwritten document from Auto Connections, dated November 16, 2002, and signed by Hughes. The document stated "sold, 1995 Dodge [Intrepid] to Tyesha Bell." The document reflected that Bell made a $900 down payment and would make weekly payments of $75 starting on November 23, 2002. Notations on the document indicated that the following payments were made in 2002: $100 on December 2, $100 on December 16, and $100 on December 26. Another notation indicated that the car was repossessed on February 15, 2003, and that Bell paid $800 on February 20 and picked up the car.

Two further payments were made: $100 on March 21, and $100 on April 4. The car was again repossessed on May 4, 2003, just days before Bell's disappearance.

¶ 25   Coursey interviewed Jamica Ynocencio on August 27, 2003. Ynocencio had briefly lived with Bell in March 2003. Ynocencio told Coursey that, when she lived with Bell, defendant would stop by nearly every night. She also said that defendant would give Bell cash to pay for rent, expenses, and visits to the hair salon. Ynocencio would sometimes babysit T.B. so that Bell could be with defendant. Bell told Ynocencio that she had told defendant, " '[E]ither you support us or I'll get child support from you[.]' "

¶ 26   In 2006, Koenings took over as lead investigator of Bell's disappearance. On December 21, 2020, Koenings was notified by law enforcement that skeletal remains, possibly belonging to a female African American, were found in a wooded area in Montgomery. The remains were found roughly two miles driving distance from Eby-Brown, where defendant had worked at the time of the disappearance. Koenings's unit believed that the remains could be Bell's. At Koenings's request, a DNA analysis was done on the remains. The State entered into evidence (1) an Illinois State Police lab report concluding that the remains matched Bell's DNA and (2) a postmortem report identifying Bell's cause of death as a single gunshot wound to the back of the head. Koenings confirmed that, based on the recovery of Bell's remains and the postmortem report, the nature of the case changed from missing person to homicide. Defendant was the only suspect in Bell's disappearance; however, instead of making an immediate arrest, Koenings decided to investigate further.

¶ 27   On March 24, 2021, Koenings conducted a follow-up interview with Latasha. She confirmed her earlier statements about the night of May 8-9, 2003. Additionally, Latasha told Koenings that, about a week before Bell's disappearance, defendant took Bell and T.B. to "look[ ]

for an apartment that [defendant] was supposedly going to buy her or rent her." Bell told Latasha that they drove around at night while it was raining, and defendant got lost, so they never found the apartment. Latasha confirmed that, at the time of the disappearance, Bell expected defendant to buy her a car.

¶ 28    In light of Bell's manner of death, Koenings contacted the Illinois State Police Firearm Service Bureau to find out whether defendant had a Firearm Owner's Identification (FOID) card and had used the card to purchase any guns. He learned that defendant obtained a FOID card in 1992 and renewed it in 1997. The card expired in 2002 and had not been renewed. No guns had ever been registered under defendant's name in the Illinois database.

¶ 29    On cross-examination, defense counsel asked Koenings about the context of Ynocencio's assertion that Bell had told defendant, " '[E]ither you support us or I'll get child support from you[.]' " Koenings confirmed that Coursey had asked Ynocencio whether Bell had "any trouble" getting child support. Ynocenio said no, and then relayed the statement made by Bell.

¶ 30    Lieutenant Greg Spayth next took the stand. He testified that Bell's cell phone records showed that she called a number at Eby-Brown six times between 11 p.m. on May 8 and 2 a.m. on May 9, 2003. At 2:28 a.m. on May 9, Bell received a phone call from a mobile number associated with defendant. The call lasted 22 seconds. Spayth learned from an employee of the mobile provider that the mobile number associated with defendant had been disabled on May 13, the same day he was interviewed by police and denied having a relationship with Bell. Defendant was provided with a new mobile phone number at that time.

¶ 31    Detective John Munn became involved with the case in 2021. He interviewed Patrick on March 26, 2021. Patrick indicated, as he had to Coursey, that he spoke to Bell the night she disappeared. Patrick said that defendant was supposed to come over later that night to deliver

money for a car. Munn and Patrick discussed the fact that defendant was married to someone else but paying cash to Bell because they shared a child. Patrick later referred to the payments as "hush money." On Munn's cross-examination, the following exchange occurred:

"Q. Isn't it true that the term hush money was [Patrick's] term, it's not what [Bell] called it, correct?

A. That's what [Patrick] relayed to me, yes.

Q. But he didn't relate to you that [Bell] told him that it was hush money, correct?

A. He did not."[1]

¶ 32 Munn testified that he and Koenings interviewed James at her home on March 26, 2021. According to James, she and Bell were very good friends and spoke at least once a day. James reiterated that she had been out shopping with Bell the day of her disappearance. At the time, James had been driving Bell where she needed to go because Bell did not have a car. During the shopping trip on May 8, 2003, Bell told James that defendant was coming over that night after he finished his shift at Eby-Brown to give her $12,000 to purchase a vehicle. James told the detectives that defendant often provided money to Bell, but not that large of a sum. James dropped Bell off at her home around 9 p.m. on May 8. She planned to pick Bell up the next morning to take her to her court date. James stated that she believed Bell was dating both Patrick and defendant at the time of her disappearance and that her relationship with defendant was "[o]n again[,] off again." James said that she may have met Patrick once, and she knew defendant because they both worked at Eby-Brown.

---

[1]It is unclear from the record whether Bell had used the term "hush money" when she spoke to Patrick.

¶ 33    On April 12, 2021, Munn interviewed Williams. She was a close friend of Bell's, and they spoke often. Williams went shopping with Bell and others on May 8, 2003. During that shopping trip, Bell said defendant was going to come over that night and give her money for a vehicle. Williams knew that defendant was married and that he often visited Bell's residence. The State then asked Munn what Williams had heard from Bell regarding child support payments:

"Q. Did you ask [Williams] if she was aware of any child support arrangements regarding the child named [T.B.]?

A. I don't recall if I did or not.

Q. Okay. Do you recall if [Bell] had told her about a formal child support—about filing formal child support paperwork?

A. She did mention something about she was going to, but I believe she claimed [defendant] talked her out of it.

Q. And that's what [Bell] had told [Williams]?

A. That's what [Williams] related to me that [Bell] had told her.

Q. Okay. Did she tell you if there was a different—if [Bell] had mentioned that instead of talking her out of it and filing for paperwork, if there was some other sort of arrangement?

A. There was.

Q. What did [Williams] tell you?

A. That [defendant] was going to give a lump sum.

* * *

Q. *** [D]id [Williams] tell you if [defendant] ever came around her friends, [Bell's] friends?

A. Well, she told me he would never come around.

Q. Why? Did she tell you why?

A. Yes, because they kept their relationship very secret because he was married."

Williams also told Munn about a time when Bell went to defendant's home and informed his wife of their relationship and child. Williams was not aware of the wife's reaction to the news.

¶ 34    On April 21, 2021, Munn interviewed Ynocencio. She said that she and Bell became friends when they were in the Kane County jail together for three or four weeks in 2003. After Ynocencio was released from jail, she stayed with Bell in her apartment for one to two weeks in March 2003. Ynocencio was aware that Bell was involved with a "married guy," but she never met him. He would stop by "practically every night" after he got off work, but he never came into the apartment. According to Ynocencio, he would call when he was close to the parking lot, and Bell would leave the apartment to meet him. Ynocencio understood from Bell that the man was not going to leave his wife.

¶ 35    On April 23, 2021, Munn and Koenings interviewed Talisha Davis at her home. She and Bell were very close friends, and they briefly lived together before Bell's sister moved in with her. Davis knew defendant from Eby-Brown. She knew that he was married and was also in a relationship with Bell. Davis said that defendant would stop by Bell's apartment after work. He would call, and then Bell would go down to meet him in the parking lot. Davis believed that defendant took care of Bell by providing clothes and luxuries. Davis said that Bell was also seeing a man named Korey, but that Bell claimed it did not affect her relationship with defendant.

¶ 36    On March 3, 2022, Munn interviewed Meeks, who had overseen conducting the DNA tests in the child support case involving Bell and defendant. According to Meeks, defendant had been very upset about the situation. Because of his reaction, Bell felt scared. The staff waited for

defendant to leave and then escorted Bell out of the building. Meeks said that Bell and defendant drove separately but were present for the testing at the same time. Meeks said she specifically remembered this case because it made her change the way she conducted such tests: she stopped allowing both parties to be present at the same time.

¶ 37    Munn and Detective Kidd (first name not given) interviewed defendant on June 14, 2022, following his arrest. Defendant said he slept with Bell only once, and she got pregnant. Defendant did not admit to having any kind of relationship with Bell. Defendant said that, at the time of Bell's disappearance, he had been driving a 1995 Cutlass. At some point after the disappearance, he loaned the car to his niece so she could drive to and from college. The police eventually took the car from the niece and processed it for evidence. Later, when the car was back in defendant's possession, the car caught on fire and burned. When asked about phone calls made from his cell phone to Bell on the night of her disappearance, defendant said that someone at his workplace must have taken his phone, made those calls, and then put the phone back. When asked about child support payments to Bell, defendant said that child support had always been garnished from his wages and that he had never given money directly to Bell.

¶ 38    At the close of the evidence, the trial court heard argument from both the State and defense counsel. According to the State, the evidence showed that defendant murdered Bell "to prevent her from being able to testify in a child support case."

¶ 39    On May 31, 2024, the court delivered its decision on the record. The court explained that, to admit hearsay statements under the doctrine of forfeiture by wrongdoing, the proponent must prove two prongs: (1) the party against whom the statement is offered has engaged or acquiesced in wrongdoing and (2) the wrongdoing was intended to, and did, procure the unavailability of the declarant as a witness. *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 98. After detailing

the evidence relating to the first prong, the court found "the State ha[d] proven by [a] preponderance of the evidence that the defendant engaged in or acquiesced in wrongdoing, specifically the disappearance and murder of Tyesha Bell."

¶ 40    The trial court found, however, that the State failed to prove the second prong. The court noted that it considered the following evidence on the second prong: (1) Bell initiated a child support case against defendant in 2001; (2) Meeks testified that defendant was angry and Bell was scared of him when DNA testing was conducted to determine T.B.'s paternity; (3) the DNA test showed defendant to be T.B.'s father, and his wages were subsequently garnished to provide child support to Bell; (4) Bell "voluntarily terminated" the child support case in November 2002; (5) Bell then began receiving cash payments directly from defendant, and "multiple *** witnesses" reported that Bell had "no trouble getting support" from defendant; (6) on the last day her friends saw her, Bell told them defendant was coming over after work to give her $12,000; and (7) Ynocencio testified that Bell told defendant, " '[E]ither you support us or I'll get child support from you[.]' "

¶ 41    The trial court elaborated on Ynocencio's statement, noting that Ynocencio had also said that Bell "was not having any problems getting child support from the defendant" and that Bell "was the type of person who expected support." The court then stated, "Based upon this, the [c]ourt cannot conclude that the statement made over the phone was a threat to the defendant." The court went on to explain its ruling:

> "While the evidence received was that defendant had fathered a child with [Bell] while he was married to someone else and that [Bell] had sought and received first court-ordered child support and later direct payments of support from the defendant, this [c]ourt

cannot find that it has received evidence showing that either [Bell] or the defendant was unhappy with the current payment arrangement.

The State argues that [Bell]'s demands for the money were increasing and that the defendant killed her to prevent her from reinstituting the child support case she had previously voluntarily dismissed in November of 2002.

However, the [c]ourt cannot find based upon the evidence presented that the State has proven the second proposition by [a] preponderance of the evidence. And for this reason then the State's motion is denied."

The State then filed a motion to reconsider, which was likewise denied. The State timely appealed.

¶ 42                                II. ANALYSIS

¶ 43    At issue in this appeal is whether the trial court's denial of the State's motion to admit the victim's statements through the doctrine of forfeiture by wrongdoing was against the manifest weight of the evidence.

¶ 44    Generally, "a witness may testify only as to facts within his personal knowledge and not as to what somebody else told him." *Novicki v. Department of Finance*, 373 Ill. 342, 344 (1940). This rule against hearsay evidence "is founded on the necessity of an opportunity for cross-examination." *Id.* The doctrine of forfeiture by wrongdoing "serves both as an exception to the hearsay rule and to the confrontation clause of the sixth amendment." *People v. Chatman*, 2024 IL 129133, ¶ 32. This common law doctrine has been codified in Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011):

"(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

* * *

> (5) Forfeiture by Wrongdoing.  A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

As our supreme court has explained, the reliability of the statements sought to be admitted is not an element of this doctrine.  *People v. Peterson*, 2017 IL 120331, ¶ 33; see *People v. Hanson*, 238 Ill. 2d 74, 99 (2010) (holding that "so long as the declarant's statements are relevant and otherwise admissible, statements admitted under the forfeiture by wrongdoing doctrine need not reflect additional indicia of reliability").  To admit hearsay evidence under the forfeiture-by-wrongdoing doctrine, only two factors must be proven: (1) that the party against whom the statement is offered has engaged or acquiesced in wrongdoing and (2) that the wrongdoing was intended to, and did, procure the unavailability of the declarant as a witness.  *Zimmerman*, 2018 IL App (4th) 170695, ¶ 98; Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011).  The State must prove these factors by a preponderance of the evidence.  *Peterson*, 2017 IL 120331, ¶ 37.  The State meets this burden when the evidence presented "renders a fact more likely than not."  (Internal quotation marks omitted.)  *Id.*

¶ 45     At a hearing to determine if the forfeiture-by-wrongdoing doctrine applies, the trial court may consider hearsay evidence, including the unavailable declarant's out-of-court statements.  *People v. Stechly*, 225 Ill. 2d 246, 278 (2007); Ill. R. Evid. 104(a) (eff. Jan. 1, 2011).  When a trial court makes a finding by a preponderance of the evidence, a reviewing court will reverse that finding only if it is against the manifest weight of the evidence.  *Peterson*, 2017 IL 120331, ¶ 39. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 46     A defendant's motive and intent are rarely proved by direct evidence; "[r]ather, they must be inferred from conduct and the surrounding circumstances." (Internal quotation marks omitted.) *Peterson*, 2017 IL 120331, ¶ 43. Notably, preventing witness testimony need not be the defendant's sole intent; the State need only prove that the "murder was motivated 'at least in part' by an intent to prevent [the declarant] from testifying." *Id.* ¶ 50 (quoting *Stechly*, 225 Ill. 2d at 272). And "the absence of pending legal proceedings is not a bar to application of the forfeiture by wrongdoing doctrine." *Id.* ¶ 58.

¶ 47     In this case, under the State's theory for admitting Bell's statements, the State had the burden to prove by a preponderance of the evidence that defendant murdered Bell and that his motive for killing her was, at least in part, to procure her availability to reinitiate or testify against him in a child support proceeding. Following an evidentiary hearing, the trial court found, as to the first prong of the forfeiture-by-wrongdoing doctrine, that the State had "proven by [a] preponderance of the evidence that the defendant engaged in or acquiesced in wrongdoing, specifically the disappearance and murder of Tyesha Bell." And, as to the second prong of the doctrine, it is undisputed that the murder *did* procure the unavailability of Bell as a witness. However, the court found that the State failed to prove by a preponderance of the evidence that the murder was intended "to prevent [Bell] from reinstituting the child support case she had previously voluntarily dismissed in November of 2002."

¶ 48     On appeal, the State argues that the trial court erred by (1) evaluating the weight and credibility to be given to Bell's statements (finding, for instance, that Bell's statement to defendant, " '[E]ither you support us or I'll get child support from you[,]' " was not a threat) and (2) "requiring direct evidence of defendant's intent, rather than properly considering the substantial circumstantial evidence establishing that preventing Bell's testimony was at least part

of his motivation for murder." With respect to circumstantial evidence, the State specifically points to

> "(1) defendant's documented hostility toward formal proceedings, manifested when Bell previously obtained wage garnishment; (2) his arrangement of undocumented cash payments after she terminated those proceedings; (3) Bell's growing dissatisfaction with informal support, culminating in her explicit threat to return to court; and finally, (4) her murder on the very night multiple witnesses confirmed she expected defendant to bring her $12,000—a dramatic increase from prior payments."

¶ 49 In response, defendant argues first that the trial court applied the correct legal framework, properly considering statements by Bell as well as circumstantial evidence. Defendant asserts that the court "accepted Bell's statements as presented and properly focused on whether, even if believed, those statements supported the inference that [defendant] acted with the intent to prevent her testimony." Defendant also asserts that "in nearly every Illinois case where the [forfeiture-by-wrongdoing] doctrine has been applied, there was clearer evidence of coercion, intimidation, or ongoing legal conflict than existed with these facts." However, defendant acknowledges that "[f]ew trial courts have *** denied a forfeiture motion after finding the first *** prong satisfied," *i.e.*, that defendant engaged in wrongdoing.

¶ 50 In support of his contention that the trial court's "careful handling of this more uncertain set of facts was appropriate, not erroneous," defendant urges us to consider the military judge's decision to exclude hearsay evidence the Government sought to admit under the doctrine of forfeiture by wrongdoing in *United States v. Becker*, a decision that was reversed by the intermediate U.S. Navy-Marine Corps Court of Criminal Appeals, but ultimately upheld by the

U.S. Court of Appeals for the Armed Services. See *United States v. Becker*, 81 M.J. 525 (N-M. Ct. Crim. App. 2021), *rev'd and remanded*, 81 M.J. 483 (C.A.A.F. 2021).

¶ 51 In *Becker*, the defendant was charged with the premeditated murder of his estranged wife. *Becker*, 81 M.J. at 532. The following evidence was produced at the hearing on the Government's motion to admit the victim's statements under the forfeiture-by-wrongdoing doctrine. In 2013, the defendant physically attacked the victim after discovering her past infidelity; she informed military police of that incident and also related prior physical abuse by the defendant. *Id.* at 527-28. The victim later recanted, and the police closed the criminal investigation into her allegations. *Id.* at 528. However, the victim told her family and friends that her assault allegations were true and that she feared for her life. *Id.* She explained that she had recanted her statements to the police because she was afraid of damaging her husband's military career. *Id.* In 2015, the couple agreed to separate, and they signed a separation agreement with provisions for raising their daughter together and continuing to work together in a joint business venture. *Id.* A few weeks later, a witness saw the victim fall from the window of the seventh-floor apartment she shared with the defendant, and she later died from her injuries. *Id.* The defendant was subsequently charged with drugging the victim and causing her to fall from the window. *Id.* at 532.

¶ 52 The trial court denied the motion to admit the victim's statements, finding that the defendant was motivated exclusively by jealousy over the victim's relationship with another man. *Id.* at 527, 534.

¶ 53 On appeal from the trial court's decision, the Government argued that "at least part of [the defendant]'s intent in killing [the victim] was to cause her unavailability as a witness" to prior acts of abuse. *Id.* at 532. According to the Government, the trial court "erroneously failed to consider important facts bearing on [the defendant]'s intent." *Id.*

¶ 54    The U.S. Navy-Marine Corps Court of Criminal Appeals reviewed the trial court's decision for an abuse of discretion. *Id.*  In reviewing the trial court's factual findings as well as the evidence available in the record, the intermediate court found that the Government had shown, by a preponderance of the evidence, not only that the defendant had killed the victim, but that "his actions were the result of planning and calculation." *Id.* at 534.  The court found premeditation especially relevant to its analysis of motivation because "the forfeiture-by-wrongdoing exception's very existence is to prevent wrongdoers from benefitting from such action through planning, scheming, or stratagem." *Id.* at 531.  The court expounded:

> "In contrast to wrongdoing committed in the heat of sudden passion as a result of fear or rage, premeditated wrongdoing is 'committed after reflection by a cool mind.' [Citation.]  Implicit in such cool reflection is the potential for multiple motives for the same wrongful act.  See, *e.g.*, *United States v. Davis*, 49 M.J. 79, 84 (C.A.A.F. 1998) (finding evidence of 'multiple motives' for the appellant's attempted premeditated murder of his wife, including pressure from his mistress to end his marriage and the alleviation of financial problems through his wife's life insurance).  Hence, where there is evidence that the wrongdoing causing a declarant's unavailability as a witness was calculated or premeditated, the trial court must closely examine whether multiple layers of motive and intent are at play, to include things like keeping a witness from reporting criminal acts or other abusive behavior, cooperating with law enforcement, participating in civil or criminal proceedings, or resorting to outside help." *Becker*, 81 M.J. at 532.

And while the trial court had found that the wrongful act had been motivated exclusively by the defendant's jealousy over his wife's relationship with another man (*id.* at 534), the intermediate court explained that

"evidence that the wrongdoing rendering the declarant unavailable was committed after reflection by a cool mind dramatically increases the need to thoroughly examine, for purposes of forfeiture by wrongdoing, whether multiple layers of motive and intent were at play. And the focus of the assessment is not on what the declarant was doing or thinking at the time, but on the subjective intent of the wrongdoer, as evidenced by his conduct."

*Id.*

Due in part to the evidence of premeditation in the record, the reviewing court agreed with the Government, finding that "the trial court erred in failing to consider important facts supporting not only that [the defendant] intentionally killed [the victim], but the full nature of his reasons for doing so." *Id.* at 535. And while that decision was ultimately reversed by the U.S. Court of Appeals for the Armed Services, that court did not take issue with the intermediate court's statement of the law but simply ruled that the intermediate court had not been sufficiently deferential to the trial court's factual determinations where the applicable standard of review was abuse of discretion. See *Becker*, 81 M.J. at 490 ("the lower court is not authorized to make factual determinations to support a simple difference of opinion between it and the military judge"). In contrast, we review the trial court's decision here under the *less deferential* manifest-weight-of-the-evidence standard. See *Best v. Best*, 223 Ill. 2d 342, 348 n.1 (2006) (comparing the two standards).

¶ 55    Much of the existing case law applying the doctrine of forfeiture by wrongdoing involves domestic violence or an acrimonious divorce. Here, the relationship between defendant and victim was fundamentally different. However, we find the intermediate court's consideration of premeditation in *Becker* instructive in this case. Here, the evidence of defendant's premeditation— such as changing his routine in the month leading up to the murder so that Bell would come to the

parking lot to meet him, and luring her outside on the night of her murder with the promise of the extraordinary sum of $12,000—suggests that the wrongdoing was "committed after reflection by a cool mind" (*Becker*, 81 M.J. at 534), which in turn suggests a strategic motive on the part of defendant. Although the facts of this case do not present evidence of open hostility or ongoing legal conflict at the time of Bell's death, the absence of conflict only further underscores the likelihood that the murder was motivated by something more than fear or rage.

¶ 56 In denying the State's motion for admission of Bell's statements, the trial court asserted that Bell had "voluntarily terminated" the child support case in November 2002. However, this assertion is contradicted by the evidence. According to one of the police reports read into the record, defendant was first interviewed on May 12, 2003. During that interview, he told Detective Gonzalez that "they were garnishing his wages for child support, but he told them she, the missing person, that she would have to have it stopped because he was going to get a lawyer and sue her and she did." The court also stated that "multiple *** witnesses" had reported that Bell had "no trouble getting [child] support"; the court concluded that it "received [no] evidence showing that either [Bell] or the defendant was unhappy with the current [child support] arrangement." But the evidence heard by the court suggests that, once Bell ended formal child support payments, defendant sought to avoid conflict and maintain the status quo by appeasing Bell through frequent cash payments and promises to provide her with housing or with a new car. Defendant knew all too well that Bell could make his life difficult by showing up at his house to confront his wife, or by seeking formal child support, which would result in the garnishment of his wages. In light of these circumstances, we find that the absence of conflict and hostility in the weeks leading up to the murder does not contradict the evidence suggesting that Bell was escalating her demands and that defendant was unable or unwilling to meet those demands. Defendant's motive and intent

must be inferred both from his conduct and the totality of the surrounding circumstances. See *Peterson*, 2017 IL 120331, ¶ 43. Here, the alleged murder took place mere days after Bell's car was repossessed, and she disappeared the same night defendant promised to deliver her $12,000 to purchase a new car, an amount far exceeding previous payments. Given defendant's demonstrated hostility toward formal child support payments and Bell's alleged statement to defendant suggesting her willingness to reinstate the child support case, we find it clearly evident that, more likely than not, the murder was motivated, at least in part, by defendant's desire to prevent Bell from reinstituting formal child support payments if he failed to meet her demands for support. Therefore, the trial court erred by excluding Bell's statements.

¶ 57                                    III. CONCLUSION

¶ 58     For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand the cause.

¶ 59     Reversed and remanded.